**Juan Anibal AGUIRRE–AGUIRRE,
Petitioner,**

v.

**IMMIGRATION AND
NATURALIZATION SERVICE,
Respondent.**

**No. 96–70267.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 7, 1997.

Decided Aug. 8, 1997.

522

Ralph J. Leardo, Law Offices of Nancy Ann Fellom, San Francisco, CA; Veronica L. Burris–Valentine, Tingey & Burris, Las Vegas, NV; Nadine K. Wettstein, Tucson, AZ, for petitioner.

Ronald E. LeFevre, Chief Legal Officer, Immigration and Naturalization Service, San Francisco, CA; Joan E. Smiley, Hugh G. Mullane, M. Jocelyn Lopez Wright, Office of Immigration Litigation, United States Department of Justice, Washington, DC, for respondent.

Before: PREGERSON, JOHN T. NOONAN, Jr., and KLEINFELD, Circuit Judges.

NOONAN, Circuit Judge:

Juan Anibal Aguirre–Aguirre (Aguirre) petitions for review of the order of the Board of Immigration Appeals (the Board) finding him ineligible for withholding of deportation and asylum. Holding that the Board has erred as a matter of law in its interpretation of 8 U.S.C. § 1253(h)(2)(C) (1994) ("serious non-political crime"), we grant the petition and remand.

### PROCEEDINGS

Aguirre entered the United States without inspection. Before the Immigration Judge (IJ) he conceded deportability and applied for asylum and withholding of deportation. He testified to his activities in Guatemala as a student leader, among them the burning of ten buses and the messing up of several stores as a way of demonstrating against the ruling government of Guatemala and in particular against its raising of student fares on the buses (an element of student transportation) and its indifference to, and possible complicity in, the mysterious disappearances and deaths of political activists. Carefully reviewing Aguirre's testimony and finding it wholly believable, the IJ granted both asylum and withholding of deportation.

On appeal by the Immigration and Naturalization Service (the Service), the Board reversed. The Board disagreed with the Service's contention that Aguirre had engaged in terrorist acts as defined by 8 U.S.C. § 1182(a)(3)(B)(ii) (1994). The Board also disagreed with the Service's contention that Aguirre was a danger to the security of the country under 8 U.S.C. § 1253(h)(2)(D) (1994) and 8 C.F.R. § 208.14(c)(3). However, the Board held that the "nature of his acts against innocent Guatemalans" made him unworthy of a favorable exercise of discretion and that therefore it was unnecessary to address his statutory eligibility for asylum. The Board further held that "the criminal nature of the respondent's acts outweigh their political nature" and that he was consequently barred from withholding of deporta-

tion without the Board needing to address the issue of his statutory eligibility for this relief. In reaching its decision the Board did not consider what Aguirre might suffer if deported to Guatemala, nor did the Board weigh the character of Aguirre's crimes in relation to his political objectives, nor did the Board follow Ninth Circuit precedent in this area. The Board also denied Aguirre voluntary departure.

Aguirre petitions for review.

### ANALYSIS

■ This case depends upon the construction of a single statutory provision, 8 U.S.C. § 1253(h)(2)(C) (1994), declaring that an alien is not entitled to withholding of deportation if the Attorney General determines that "there are serious reasons for considering that the alien has committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States." We review de novo the Board's interpretation of the requirements for establishing eligibility for withholding of deportation. *Abedini v. INS*, 971 F.2d 188, 190–91 (9th Cir.1992).

The statute at issue here has been considered by us in *McMullen v. INS*, 788 F.2d 591 (9th Cir.1986). Construing the statute, we found that Congress "intended the nonpolitical crimes exception to withholding of deportation to be consistent with the Convention [Relating to the Status of Refugees, 189 U.N.T.S. 150 (1951) ] and Protocol [Relating to the Status of Refugees, 19 U.S.T. 6223 (1968) ]." *McMullen*, 788 F.2d at 595. The United States is a party to the Protocol, and the Protocol, Article 1.2, defines the term "refugee" as "any person within the definition of Article 1 of the Convention." The relevant definition in Article 1F of the Convention excludes a person who "has committed a serious non-political crime outside the country of refuge prior to his admission to that country as a refugee."

In April, 1996 the Immigration and Nationality Act, 8 U.S.C. 1253(h), was amended by providing that an alien must be granted withholding of deportation if such grant was "necessary to ensure compliance with the 1967 United Nations Protocol Relating to the Status of Refugees." Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, § 413(f), 110 Stat. 1214, 1269 (1996) (adding 8 U.S.C. § 1253(h)(3)). It is unnecessary for us to determine whether this statute applies to Aguirre's case because under *McMullen* we are already bound to apply the Protocol in decisions regarding the withholding of deportation.

Interpreting and applying the statute in the light of *McMullen* and the Protocol, we find that the Board committed errors of law. First, the Board looked only at the offenses of Aguirre, which at common law would be considered crimes against property (the burning of the buses and the throwing of store merchandise on the floor) and minor assaults and batteries (the means taken to get reluctant bus passengers off the buses before their destruction). The Board did not consider these offenses in relation to Aguirre's declared political objectives. Under the Protocol the Board should have first determined the nature and purpose of Auirre's acts, that is whether they were "committed out of genuine political motives and not merely for personal reasons or gain," as stated by an authoritative commentary on the Convention and Protocol. United Nations High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* ¶ 152 (1979) [hereafter UNHCR, *Handbook* ]. *See INS v. Cardoza–Fonseca*, 480 U.S. 421, 438–39, 107 S.Ct. 1207, 1216–17, 94 L.Ed.2d 434 (1987) (relying on *Handbook* for definition of "refugee"). The Board should have further considered whether there is "a close and direct causal link between the crime[s] committed and [their] alleged political purpose and object." UNHCR, *Handbook, supra*, ¶ 152.

Aguirre's political purpose (there was no personal motivation or gain) was to challenge a government which there was reason to suspect engaged in the actual murder of its own citizens and which was certainly an accomplice in such murder by its failure to investigate the homicides and prosecute them. When you are dealing with an ass it may be necessary to move the beast by a

blow on a sensitive part even though what you want to move are the feet. When you are dealing with a government which is an accomplice or an accessory to terroristic methods of government you need to use forceful measures to draw the government's attention to your protest; your political objective is a governmental response, you look for a sensitive area. Aguirre's methods, as he testified, were successful as to this objective. The government had to resort to television appeals to stop the student actions. The methods were also successful enough to earn the enmity of a rival rebel group, "the guerrillas," who resented the students' way of demonstrating against the government. The Board should have considered the political necessity and success of Aguirre's methods, weighing their political character against their criminal content.

In making this inquiry the Board should have considered whether the acts committed were "grossly out of proportion to the alleged objective." UNHCR, *Handbook, supra,* ¶ 152. The political nature of the offenses would be "more difficult to accept" if they involved "acts of an atrocious nature." *Id.* The Board made its second error of law in failing to consider Ninth Circuit precedent in this regard. *McMullen* cast light on what under the law are acts of atrocious nature. They are the acts attributed to the Provisional Irish Republican Army (PIRA) which made McMullen ineligible for withholding of deportation, i.e., "indiscriminate bombing campaigns, ... murder, torture, and maiming of innocent civilians who disagreed with the PIRA's objectives and methods." *McMullen,* 788 F.2d at 597. A comparison of what the *McMullen* court found atrocious with the acts committed by Aguirre suggests a startling degree of difference. Aguirre did not engage in indiscriminate bombing, murder, torture, or the maiming of innocent civilians. His only acts against innocent Guatemalans were the disruption of some stores and his use of methods that we would all find objectionable if practiced upon us on a bus in the United States but which fall far short of the kind of atrocities attributed to McMullen and his associates.

Third, the Board erred as a matter of law in failing to consider the persecution that Aguirre might suffer if returned to Guatemala. "If a person has well-founded fear of very severe persecution, e.g. persecution endangering his life or freedom, a crime must be very grave in order to exclude him." UNHCR, *Handbook, supra,* ¶ 156. Aguirre testified without contradiction to the death threats that he and other student leaders had received and to the fact that several of the student leaders who had been threatened had been killed after he left the country. Aguirre could well be found to be in danger of losing his life if returned to Guatemala and therefore should be excluded for his crimes only "for the most serious reasons." Guy S. Goodwin–Gill, *The Refugee in International Law* 107 (2nd ed.1996). The Board did not attempt to balance his admitted offenses against the danger to him of death if returned to his native land.

We review for abuse of discretion the Board's decision that Aguirre was undeserving of a favorable exercise of discretion on his claim for asylum. *Rodriguez–Matamoros v. INS,* 86 F.3d 158, 160 (9th Cir.1996). The Board based its decision solely on Aguirre's activities as a student in Guatemala. Noting the Board's errors of law in its analysis of Aguirre's eligibility for withholding of deportation, we also remand for the Board to reconsider whether Aguirre should be granted asylum.

For these reasons we GRANT the petition and REMAND to the Board.

KLEINFELD, Circuit Judge, dissenting:

I respectfully dissent.

The BIA correctly identified the legal question, whether "the criminal nature of the respondent's acts outweigh their political nature." The crime need not, to exclude asylum, be "atrocious" (and Aguirre–Aguirre's was not) if it "is disproportionate to the objective." *McMullen v. INS,* 788 F.2d 591, 595 (9th Cir.1986). Because the BIA opinion analyzes the question as the majority opinion says it should, the majority cannot (and does not) point to legal error. The issue is entirely one of weighing Aguirre–Aguirre's crimes against his political objectives.

Aguirre–Aguirre testified in support of his asylum claim that his political purpose was to protest the high bus fares, and also to protest government failure to investigate disappearances and murders. The actions he took were neither peaceful nor directed at the government. They were violent, and directed at uninvolved people. Here is Aguirre–Aguirre's own description, worth reading in full, on cross examination by government counsel, of the criminal activities of which he was a leader:

> ... we burned buses .... splashing with gasoline and then burned them and then burned the tires and all.

Q. And were there any people on board these buses when you did this?

A. No, because we would stop the bus, help all the people get out of the bus, and then because there were so many, we would just stone them and make them get away and then burn the bus.

Q. To your knowledge, was anyone hurt during any of these bus burnings or stonings?

.    .    .    .    .

A. No, we just hit them if they did not want to get off the bus.

Q. How did you hit them? Did you strike them with a club, or how?

A. We would have sticks, you know, to hit them with, or we would just tie them with ropes. But, if they be, I mean, if they hit our, uh, bus then we get off the bus.

Q. And, these people who were on the bus were just ordinary citizens of Guatemala?

A. Yes.

.    .    .    .    .

Q. When you were burning these buses and throwing rocks and things at people, did you cover your face with a bandanna or in some other way hide your identity?

A. Yes, we would cover our faces.

Q. And during the times that you burned the buses, you say you also broke windows and other things?

A. Yeah, we would break the windows of the stores and we would just take, I mean, uh, raid the stores. Taking everything they have.

Q. So, you were, in other words, looting the stores?

A. No, we did not steal from the stores. We simply took the people out of the stores that were there. And we would throw everything on the floor.

Q. The people who were in the stores, did you treat them in a similar fashion that you treated the people on the bus, that is, throw rocks at them and hit them with sticks and tie them with ropes in order to get them to go?

A. If they did not try to do anything to us, we would not do anything to them. Because, we would always explain to the people who were there in the buses, for instance, why we were doing this and why we were protesting and doing these things, because of the high fares that the buses had. Some of them would even support us.

Could the BIA reasonably conclude that Aguirre–Aguirre's crimes were disproportionate to his political objectives? Yes indeed.

My colleagues read the evidence as "crimes against property" combined with "minor assaults and batteries." Beating people with sticks and stoning them, does not seem "minor" to me. Hitting someone on the head with a stick in the nature of a baseball bat or a stone in the nature of a brick is reasonably likely to cause brain damage. It is hard to imagine a band of masked young men, angry enough to burn buses, being especially gentle and kind as they stone people, hit them with "sticks," and tie them up. There is no reason to suppose that the sticks were like the flexible yardsticks one gets for free at the hardware store, as opposed to baseball bats. The bus passengers, perhaps travelling to work or going home exhausted at the end of hard days, probably would not interrupt their journeys for a bunch of angry boys with little sticks. The shopkeepers, not their inanimate inventory, were the victims of having their stores trashed. Nor is it evident to me why burning buses and trashing stores is proportional to a protest largely directed at bus fares.

(When he testified, Aguirre–Aguirre sometimes forgot to mention that his group was also upset about disappearances.)

Asylum law is supposed to protect innocent victims of persecution. We grossly distort it by requiring the government to give asylum to violent criminals. The United States should be a haven for innocent people fleeing persecution. It should not be a haven for thugs.