# IMMIGRATION AND NATURALIZATION SERVICE *v.*
## AGUIRRE-AGUIRRE

No. 97–1754.   Argued March 3, 1999—Decided May 3, 1999

Kᴇɴɴᴇᴅʏ, J., delivered the opinion for a unanimous Court.

*Patricia A. Millett* argued the cause for petitioner. With her on the briefs were *Solicitor General Waxman, Assistant Attorney General Hunger, Deputy Solicitor General Kneedler, Alison R. Drucker,* and *M. Jocelyn Lopez Wright.*

*Nadine K. Wettstein* argued the cause for respondent. With her on the brief were *Ira J. Kurzban, Karen Musalo,* and *Carolyn Patty Blum.**

---

*Briefs of *amici curiae* urging affirmance were filed for the Massachusetts Law Reform Institute et al. by *Iris Gomez;* for the Lawyers Committee for Human Rights by *Sheldon E. Hochberg;* and for the Office of the United Nations High Commissioner for Refugees by *Daniel Wolf, Regina Germain,* and *Andrew I. Schoenholtz.*

JUSTICE KENNEDY delivered the opinion of the Court.

We granted certiorari to consider the analysis employed by the Court of Appeals in setting aside a determination of the Board of Immigration Appeals (BIA). The BIA ruled that respondent, a native and citizen of Guatemala, was not entitled to withholding of deportation based on his expressed fear of persecution for earlier political activities in Guatemala. The issue in the case is not whether the persecution is likely to occur, but whether, even assuming it is, respondent is ineligible for withholding because he "committed a serious nonpolitical crime" before his entry into the United States. 8 U. S. C. § 1253(h)(2)(C). The beginning point for the BIA's analysis was its determination that respondent, to protest certain governmental policies in Guatemala, had burned buses, assaulted passengers, and vandalized and destroyed property in private shops, after forcing customers out. These actions, the BIA concluded, were serious nonpolitical crimes. In reaching this conclusion, it relied on a statutory interpretation adopted in one of its earlier decisions, *Matter of McMullen*, 19 I. & N. Dec. 90 (BIA 1984), aff'd, 788 F. 2d 591 (CA9 1986).

On appeal, the Court of Appeals for the Ninth Circuit concluded the BIA had applied an incorrect interpretation of the serious nonpolitical crime provision, and it remanded for further proceedings. In the Court of Appeals' view, as we understand it, the BIA erred by misconstruing the controlling statute and by employing an analytical framework insufficient to take account of the Court of Appeals' own precedent on this subject. According to the court, the BIA erred in failing to consider certain factors, including "the political necessity and success of Aguirre's methods"; whether his acts were grossly out of proportion to their objective or were atrocious; and the persecution respondent might suffer upon return to Guatemala. 121 F. 3d 521, 524 (1997).

We granted certiorari. 525 U. S. 808 (1998). We disagree with the Court of Appeals and address each of the three specific areas in which it found the BIA's analysis deficient. We reverse the judgment of the court and remand for further proceedings.

I

The statutory provision for withholding of deportation that is applicable here provides that "[t]he Attorney General shall not deport or return any alien . . . to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U. S. C. § 1253(h)(1). The provision was added to the Immigration and Nationality Act (INA), 66 Stat. 166, 8 U. S. C. § 1101 *et seq.* (1994 ed. and Supp. III), by the Refugee Act of 1980 (Refugee Act), Pub. L. 96–212, 94 Stat. 102. See *INS* v. *Stevic,* 467 U. S. 407, 414–416, 421–422 (1984). As a general rule, withholding is mandatory if an alien "establish[es] that it is more likely than not that [he] would be subject to persecution on one of the specified grounds," *id.,* at 429–430, but the statute has some specific exceptions. As is relevant here, withholding does not apply, and deportation to the place of risk is authorized, "if the Attorney General determines that"

> "there are serious reasons for considering that the alien has committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States." 8 U. S. C. § 1253(h)(2)(C).

Under the immigration laws, withholding is distinct from asylum, although the two forms of relief serve similar purposes. Whereas withholding only bars deporting an alien to a particular country or countries, a grant of asylum permits an alien to remain in the United States and to apply for permanent residency after one year. See *INS* v. *Cardoza-*

*Fonseca*, 480 U. S. 421, 428–429, n. 6 (1987). In addition, whereas withholding is mandatory unless the Attorney General determines one of the exceptions applies, the decision whether asylum should be granted to an eligible alien is committed to the Attorney General's discretion. *Ibid.* As a consequence, under the law then in force, respondent was able to seek asylum irrespective of his eligibility for withholding.

As an incidental point, we note that in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. 104–208, 110 Stat. 3009–546,. Congress revised the withholding and asylum provisions. The withholding provisions are now codified at 8 U. S. C. § 1231(b)(3) (1994 ed., Supp. III), and the asylum provisions at § 1158. Under current law, as enacted by IIRIRA, the Attorney General may not grant asylum if she determines "there are serious reasons for believing that the alien has committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States." § 1158(b)(2)(A)(iii). The parties agree IIRIRA does not govern respondent's case. See IIRIRA, Tit. III–A, §§ 309(a), (c), 110 Stat. 3009–625; IIRIRA, Div. C, Tit. VI–A, § 604(c), 110 Stat. 3009–692. Prior to IIRIRA, in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. 104–132, Tit. IV–B, § 413(f), 110 Stat. 1269, Congress granted the Attorney General discretion to withhold deportation when necessary to ensure compliance with the international treaty upon which the Refugee Act was based, see *infra*, at 427–429. This provision was made applicable to "applications filed before, on, or after" April 24, 1996, "if final action has not been taken on them before such date." AEDPA § 413(g), 110 Stat. 1269–1270. The BIA's decision constituted final action when rendered on March 5, 1996, 8 CFR § 243.1 (1995), App. to Pet. for Cert. 12a, so AEDPA § 413(f) was not applicable to respondent's case.

We turn to the matter before us. In 1994, respondent was charged with deportability by the Immigration and Naturalization Service (INS) for illegal entry into the United States. Respondent conceded deportability but applied for asylum and withholding. At a hearing before an Immigration Judge respondent testified, through an interpreter, that he had been politically active in Guatemala from 1989 to 1992 with a student group called Estudeante Syndicado (ES) and with the National Central Union political party. App. 19–20, 36–37. He testified about threats due to his political activity. The threats, he believed, were from different quarters, including the Guatemalan Government, right-wing government support groups, and left-wing guerillas. App. to Pet. for Cert. 23a.

Respondent described activities he and other ES members engaged in to protest various government policies and actions, including the high cost of bus fares and the government's failure to investigate the disappearance or murder of students and others. App. 20–21; App. to Pet. for Cert. 22a–23a. For purposes of our review, we assume that the amount of bus fares is an important political and social issue in Guatemala. We are advised that bus fare represents a significant portion of many Guatemalans' annual living expense, and a rise in fares may impose substantial economic hardship. See Brief for Massachusetts Law Reform Institute et al. as *Amicus Curiae* 18–19. In addition, government involvement with fare increases, and other aspects of the transportation system, has been a focus of political discontent in that country. *Id.*, at 16–21.

According to the official hearing record, respondent testified that he and his fellow members would "strike" by "burning buses, breaking windows or just attacking the police, police cars." App. 20. Respondent estimated that he participated in setting about 10 buses on fire, after dousing them with gasoline. *Id.*, at 46. Before setting fire to the buses, he and his group would order passengers to leave

the bus. Passengers who refused were stoned, hit with sticks, or bound with ropes. *Id.*, at 46–47. In addition, respondent testified that he and his group "would break the windows of . . . stores," "t[ake] the people out of the stores that were there," and "throw everything on the floor." *Id.*, at 48.

The Immigration Judge granted respondent's applications for withholding of deportation and for asylum, finding a likelihood of persecution for his political opinions and activities if he was returned to Guatemala. App. to Pet. for Cert. 31a–32a. The INS appealed to the BIA. Respondent did not file a brief with the BIA, although his request for an extension of time to do so was granted. Brief for Petitioner 10, n. 6; Record 13–15. The BIA sustained the INS's appeal from this decision, vacated the Immigration Judge's order, and ordered respondent deported. App. to Pet. for Cert. 18a. With respect to withholding, the BIA did not decide whether respondent had established the requisite risk of persecution because it determined that, in any event, he had committed a serious nonpolitical crime within the meaning of § 1253(h)(2)(C).

In addressing the definition of a serious nonpolitical crime, the BIA applied the interpretation it first set forth in *Matter of McMullen*, 19 I. & N. Dec., at 97–98: "In evaluating the political nature of a crime, we consider it important that the political aspect of the offense outweigh its common-law character. This would not be the case if the crime is grossly out of proportion to the political objective or if it involves acts of an atrocious nature." In the instant case, the BIA found, "the criminal nature of the respondent's acts outweigh their political nature." App. to Pet. for Cert. 18a. The BIA acknowledged respondent's dissatisfaction with the Guatemalan Government's "seeming inaction in the investigation of student deaths and in its raising of student bus fares." *Ibid.* It said, however: "The ire of the ES manifested itself disproportionately in the destruction of property and

assaults on civilians. Although the ES had a political agenda, those goals were outweighed by their criminal strategy of strikes . . . ." *Ibid.* The BIA further concluded respondent should not be granted discretionary asylum relief in light of "the nature of his acts against innocent Guatemalans." *Id.*, at 17a.

A divided panel of the Court of Appeals granted respondent's petition for review and remanded to the BIA. 121 F. 3d 521 (CA9 1997). According to the majority, the BIA's analysis of the serious nonpolitical crime exception was legally deficient in three respects. First, the BIA should have "consider[ed] the persecution that Aguirre might suffer if returned to Guatemala" and "balance[d] his admitted offenses against the danger to him of death." *Id.*, at 524. Second, it should have "considered whether the acts committed were grossly out of proportion to the[ir] alleged objective" and were "of an atrocious nature," especially with reference to Ninth Circuit precedent in this area. *Ibid.* (internal quotation marks and citation omitted). Third, the BIA "should have considered the political necessity and success of Aguirre's methods." *Id.*, at 523–524.

Judge Kleinfeld dissented. In his view, "[t]he BIA correctly identified the legal question, whether 'the criminal nature of the respondent's acts outweigh their political nature.'" *Id.*, at 524 (quoting *McMullen* v. *INS*, 788 F. 2d 591, 592 (CA9 1986)). Given the violent nature of respondent's acts, and the fact the acts were in large part directed against innocent civilians, the BIA "reasonably conclude[d] that [his] crimes were disproportionate to his political objectives." 121 F. 3d, at 525.

## II

As an initial matter, the Court of Appeals expressed no disagreement with the Attorney General or the BIA that the phrase "serious nonpolitical crime" in §1253(h)(2)(C) should be applied by weighing "the political nature" of an act against its "common-law" or "criminal" character. See *Mat-*

*ter of McMullen, supra,* at 97–98; App. to Pet. for Cert. 18a; *Deportation Proceedings for Doherty,* 13 Op. Off. Legal Counsel 1, 23 (1989) (an act " 'should be considered a serious nonpolitical crime if the act is disproportionate to the objective' ") (quoting *McMullen* v. *INS, supra,* at 595), rev'd on other grounds, *Doherty* v. *INS,* 908 F. 2d 1108 (CA2 1990), rev'd, 502 U. S. 314 (1992). Nor does respondent take issue with this basic inquiry.

The Court of Appeals did conclude, however, that the BIA must supplement this weighing test by examining additional factors. In the course of its analysis, the Court of Appeals failed to accord the required level of deference to the interpretation of the serious nonpolitical crime exception adopted by the Attorney General and BIA. Because the Court of Appeals confronted questions implicating "an agency's construction of the statute which it administers," the court should have applied the principles of deference described in *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837, 842 (1984). Thus, the court should have asked whether "the statute is silent or ambiguous with respect to the specific issue" before it; if so, "the question for the court [was] whether the agency's answer is based on a permissible construction of the statute." *Id.,* at 843. See also *INS* v. *Cardoza-Fonseca,* 480 U. S., at 448–449.

It is clear that principles of *Chevron* deference are applicable to this statutory scheme. The INA provides that "[t]he Attorney General shall be charged with the administration and enforcement" of the statute and that the "determination and ruling by the Attorney General with respect to all questions of law shall be controlling." 8 U. S. C. § 1103(a)(1) (1994 ed., Supp. III). Section 1253(h), moreover, in express terms confers decisionmaking authority on the Attorney General, making an alien's entitlement to withholding turn on the Attorney General's "determin[ation]" whether the statutory conditions for withholding have been

met. 8 U. S. C. §§ 1253(h)(1), (2). In addition, we have recognized that judicial deference to the Executive Branch is especially appropriate in the immigration context where officials "exercise especially sensitive political functions that implicate questions of foreign relations." *INS* v. *Abudu*, 485 U. S. 94, 110 (1988). A decision by the Attorney General to deem certain violent offenses committed in another country as political in nature, and to allow the perpetrators to remain in the United States, may affect our relations with that country or its neighbors. The judiciary is not well positioned to shoulder primary responsibility for assessing the likelihood and importance of such diplomatic repercussions.

The Attorney General, while retaining ultimate authority, has vested the BIA with power to exercise the "discretion and authority conferred upon the Attorney General by law" in the course of "considering and determining cases before it." 8 CFR § 3.1(d)(1) (1998). Based on this allocation of authority, we recognized in *Cardoza-Fonseca, supra,* that the BIA should be accorded *Chevron* deference as it gives ambiguous statutory terms "concrete meaning through a process of case-by-case adjudication" (though we ultimately concluded that the agency's interpretation in that case was not sustainable). 480 U. S., at 448–449. In the case before us, by failing to follow *Chevron* principles in its review of the BIA, the Court of Appeals erred.

### A

The Court of Appeals' error is clearest with respect to its holding that the BIA was required to balance respondent's criminal acts against the risk of persecution he would face if returned to Guatemala. In *Matter of Rodriguez-Coto,* 19 I. & N. Dec. 208, 209–210 (1985), the BIA "reject[ed] any interpretation of the phras[e] . . . 'serious nonpolitical crime' in [§ 1253(h)(2)(C)] which would vary with the nature of evidence of persecution." The text and structure of § 1253(h) are consistent with this conclusion. Indeed, its

words suggest that the BIA's reading of the statute, not the interpretation adopted by the Court of Appeals, is the more appropriate one. As a matter of plain language, it is not obvious that an already-completed crime is somehow rendered less serious by considering the further circumstance that the alien may be subject to persecution if returned to his home country. See *ibid.* ("We find that the modifie[r] . . . 'serious' . . . relate[s] only to the nature of the crime itself").

It is important, too, as *Rodriguez-Coto* points out, *id.*, at 209–210, that for aliens to be eligible for withholding at all, the statute requires a finding that their "life or freedom would be threatened in [the country to which deportation is sought] on account of their race, religion, nationality, membership in a particular social group, or political opinion," *i. e.*, that the alien is at risk of persecution in that country. 8 U. S. C. § 1253(h)(1). By its terms, the statute thus requires independent consideration of the risk of persecution facing the alien before granting withholding. It is reasonable to decide, as the BIA has done, that this factor can be considered on its own and not also as a factor in determining whether the crime itself is a serious, nonpolitical crime. Though the BIA in the instant case declined to make findings respecting the risk of persecution facing respondent, App. to Pet. for Cert. 18a, this was because it determined respondent was barred from withholding under the serious nonpolitical crime exception. *Ibid.* The BIA, in effect, found respondent ineligible for withholding even on the assumption he could establish a threat of persecution. This approach is consistent with the language and purposes of the statute.

In reaching the contrary conclusion and ruling that the risk of persecution should be balanced against the alien's criminal acts, the Court of Appeals relied on a passage from the Office of the United Nations High Commissioner for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status (Geneva, 1979) (U. N. Handbook).

We agree the U. N. Handbook provides some guidance in construing the provisions added to the INA by the Refugee Act. *INS* v. *Cardoza-Fonseca,* 480 U. S., at 438–439, and n. 22. As we explained in *Cardoza-Fonseca,* "one of Congress' primary purposes" in passing the Refugee Act was to implement the principles agreed to in the 1967 United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U. S. T. 6224, T. I. A. S. No. 6577 (1968), to which the United States acceded in 1968. 480 U. S., at 436–437. The Protocol incorporates by reference Articles 2 through 34 of the United Nations Convention Relating to the Status of Refugees, 189 U. N. T. S. 150 (July 28, 1951), reprinted in 19 U. S. T., at 6259, 6264–6276. The basic withholding provision of § 1253(h)(1) parallels Article 33, which provides that "[n]o Contracting State shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." *Id.,* at 6276. The Convention, in a part incorporated by the Protocol, also places certain limits on the availability of this form of relief; as pertinent here, the Convention states that its provisions "shall not apply to any person with respect to whom there are serious reasons for considering that . . . he has committed a serious non-political crime outside the country of refuge prior to his admission to that country as a refugee." Convention Art. I(F)(b), 19 U. S. T., at 6263–6264. Paragraph 156 of the U. N. Handbook, the portion relied upon by the Court of Appeals, states that in applying the serious non-political crime provision of Convention Art. I(F)(b), "it is . . . necessary to strike a balance between the nature of the offence presumed to have been committed by the applicant and the degree of persecution feared . . . ."

The U. N. Handbook may be a useful interpretative aid, but it is not binding on the Attorney General, the BIA, or United States courts. "Indeed, the Handbook itself dis-

claims such force, explaining that 'the determination of refugee status under the 1951 Convention and the 1967 Protocol . . . is incumbent upon the Contracting State in whose territory the refugee finds himself.'" *INS* v. *Cardoza-Fonseca,* 480 U. S., at 439, n. 22 (quoting U. N. Handbook ¶ (ii), at 1). See also 480 U. S., at 439, n. 22 ("We do not suggest, of course, that the explanation in the U. N. Handbook has the force of law or in any way binds the INS . . ."). For the reasons given, *supra,* at 425–426, we think the BIA's determination that § 1253(h)(2)(C) requires no additional balancing of the risk of persecution rests on a fair and permissible reading of the statute. See also *T.* v. *Secretary of State for the Home Dept.,* 2 All E. R. 865, 882 (H. L. 1996) (Lord Mustill) ("[T]he crime either is or is not political when committed, and its character cannot depend on the consequences which the offender may afterwards suffer if he is returned").

## B

Also relying on the U. N. Handbook, the Court of Appeals held that the BIA "should have considered whether the acts committed were 'grossly out of proportion to the alleged objective.' . . . The political nature of the offenses would be 'more difficult to accept' if they involved 'acts of an atrocious nature.'" 121 F. 3d, at 524 (quoting U. N. Handbook ¶ 152, at 36). The court further suggested that the BIA should have considered prior Circuit case law that "cast[s] light on what under the law are acts of [an] atrocious nature." 121 F. 3d, at 524. Citing its own opinion affirming the BIA's decision in *Matter of McMullen,* see *McMullen* v. *INS,* 788 F. 2d 591 (CA9 1986), the Court of Appeals stated that "[a] comparison of what the *McMullen* court found atrocious with the acts committed by Aguirre suggests a startling degree of difference." 121 F. 3d, at 524. It reasoned that while *McMullen* had involved "indiscriminate bombing, murder, torture, [and] the maiming of innocent civilians," respondent's "only acts against innocent Guatemalans were

the disruption of some stores and his use of methods that we would all find objectionable if practiced upon us on a bus in the United States but which fall far short of the kind of atrocities attributed to McMullen and his associates." 121 F. 3d, at 524.

We do not understand the BIA to dispute that these considerations—gross disproportionality, atrociousness, and comparisons with previous decided cases—may be important in applying the serious nonpolitical crime exception. In fact, by the terms of the BIA's test (which is similar to the language quoted by the Court of Appeals from the U. N. Handbook), gross disproportion and atrociousness are relevant in the determination. According to the BIA: "In evaluating the political nature of a crime, we consider it important that the political aspect of the offense outweigh its common-law character. This would not be the case if the crime is grossly out of proportion to the political objective or if it involves acts of an atrocious nature." *Matter of McMullen*, 19 I. & N. Dec., at 97–98. See also *Deportation Proceedings for Doherty*, 13 Op. Off. Legal Counsel, at 22–26, rev'd on other grounds, *Doherty* v. *INS*, 908 F. 2d 1108 (CA2 1990), rev'd, 502 U. S. 314 (1992). The BIA's formulation does not purport to provide a comprehensive definition of the § 1253(h)(2)(C) exception, and the full elaboration of that standard should await further cases, consistent with the instruction our legal system always takes from considering discrete factual circumstances over time. See also 13 Op. Off. Legal Counsel, at 23 ("[T]he statute recognizes that cases involving alleged political crimes arise in myriad circumstances, and that what constitutes a 'serious nonpolitical crime' is not susceptible of rigid definition"). Our decision takes into account that the BIA's test identifies a general standard (whether the political aspect of an offense outweighs its common-law character) and then provides two more specific inquiries that may be used in applying the rule: whether there is a gross disproportion between means and

ends, and whether atrocious acts are involved. Under this approach, atrocious acts provide a clear indication that an alien's offense is a serious nonpolitical crime. In the BIA's judgment, where an alien has sought to advance his agenda by atrocious means, the political aspect of his offense may not fairly be said to predominate over its criminal character. Commission of the acts, therefore, will result in a denial of withholding. The criminal element of an offense may outweigh its political aspect even if none of the acts are deemed atrocious, however. For this reason, the BIA need not give express consideration to the atrociousness of the alien's acts in every case before determining that an alien has committed a serious nonpolitical crime.

The BIA's approach is consistent with the statute, which does not equate every serious nonpolitical crime with atrocious acts. Cf. 8 U. S. C. § 1253(h)(2)(B) (establishing an exception to withholding for a dangerous alien who has been convicted of a "particularly serious crime," defined to include an "aggravated felony"). Nor is there any reason to find this equivalence under the statute. In common usage, the word "atrocious" suggests a deed more culpable and aggravated than a serious one. See Webster's Third New International Dictionary 139 (1971) (defining "atrocious" as, "marked by or given to extreme wickedness . . . [or] extreme brutality or cruelty"; "outrageous: violating the bounds of common decency"; "marked by extreme violence: savagely fierce: murderous"; "utterly revolting: abominable"). As a practical matter, if atrocious acts were deemed a necessary element of all serious nonpolitical crimes, the Attorney General would have severe restrictions upon her power to deport aliens who had engaged in serious, though not atrocious, forms of criminal activity. These restrictions cannot be discerned in the text of § 1253(h), and the Attorney General and BIA are not bound to impose the restrictions on themselves.

In the instant case, the BIA determined that "the criminal nature of the respondent's acts outweigh their political nature" because his group's political dissatisfaction "manifested itself disproportionately in the destruction of property and assaults on civilians" and its political goals "were outweighed by [the group's] criminal strategy of strikes." App. to Pet. for Cert. 18a. The BIA concluded respondent had committed serious nonpolitical crimes by applying the general standard established in its prior decision, so it had no need to consider whether his acts might also have been atrocious. The Court of Appeals erred in holding otherwise.

We further reject the Court of Appeals' suggestion that reversal was required due to the BIA's failure to compare the facts of this case with those of *McMullen*. The court thought doing so was necessary because of the guidance provided by *McMullen* on the meaning of atrociousness. In light of our holding that the BIA was not required expressly to consider the atrociousness of respondent's acts, the BIA's silence on this point does not provide a ground for reversal.

C

The third reason given by the Court of Appeals for reversing the BIA was what the court deemed to be the BIA's failure to consider respondent's "offenses in relation to [his] declared political objectives" and to consider "the political necessity and success of [his] methods." 121 F. 3d, at 523–524. As we have discussed, *supra*, at 422–423 and this page, the BIA did address the relationship between respondent's political goals and his criminal acts, concluding that the violence and destructiveness of the crimes, and their impact on civilians, were disproportionate to his acknowledged political objectives. To the extent the court believed the BIA was required to give more express consideration to the "necessity" and "success" of respondent's actions, it erred.

It is true the Attorney General has suggested that a crime will not be deemed political unless there is a "'close and direct causal link between the crime committed and its alleged political purpose and object.'" *Deportation Proceedings for Doherty*, 13 Op. Off. Legal Counsel, at 23 (quoting *McMullen v. INS*, 788 F. 2d 591 (CA9 1986)). The BIA's analysis, which was quite brief in all events, did not explore this causal link beyond noting the general disproportion between respondent's acts and his political objectives. Whatever independent relevance a causal link inquiry might have in another case, in this case the BIA determined respondent's acts were not political based on the lack of proportion with his objectives. It was not required to do more. Even in a case with a clear causal connection, a lack of proportion between means and ends may still render a crime nonpolitical. Moreover, it was respondent who bore the burden of proving entitlement to withholding, see 8 CFR § 208.16(c)(3) (1995) ("If the evidence indicates that one or more of the grounds for denial of withholding of deportation . . . apply, the applicant shall have the burden of proving by a preponderance of the evidence that such grounds do not apply"). He failed to submit a brief on the causal link or any other issue to the BIA, and the decision of the Immigration Judge does not address the point. In these circumstances, the rather cursory nature of the BIA's discussion does not warrant reversal.

## III

Finally, respondent contends the record of his testimony before the Immigration Judge contains errors. He testified in Spanish and now contends there are errors in translation and transcription. Brief for Respondent 11–22. Respondent advanced this argument for the first time in his Brief in Opposition to Certiorari in this Court, see Brief in Opposition 1–5, having failed to raise it before either the BIA or the Court of Appeals. We decline to address the argument at this late stage.

Respondent has filed a motion in the BIA for a new hearing in light of the alleged errors. App. to Brief for Respondent 1a–6a. Should the BIA determine modification of the record is necessary, it can determine whether further consideration of the withholding issue is warranted.

\* \* \*

The reasons given by the Court of Appeals for reversing the BIA do not withstand scrutiny. We reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*