**NOT RECOMMENDED FOR PUBLICATION**
File Name: 05a0996n.06
Filed: December 21, 2005

**No. 04-3948**


**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**TOUFIK BELEH,**

    **Petitioner,**

**v.**

**ALBERTO GONZALES, United States Attorney General,**

    **Respondent.**

**ON APPEAL FROM THE BOARD OF IMMIGRATION APPEALS**

_____/


**BEFORE:** **SILER, CLAY and ROGERS**, **Circuit Judges.**

    **CLAY, Circuit Judge.** Petitioner Toufik Beleh, a native and citizen of Algeria, petitions this Court for review of the decision of the Board of Immigration Appeals ("BIA"), affirming the immigration judge's ("IJ") denial of Petitioner's application for asylum, and in the alternative, withholding of removal. For the reasons set forth below, we **DENY** the petition for review.

**I. BACKGROUND**

    Petitioner is a native and citizen of Algeria. Petitioner entered the United States on or about September 15, 1996, without inspection, near San Ysirdo, California. Petitioner filed an asylum application, and on July 13, 1998, the Immigration Naturalization Service ("INS") issued Petitioner a Notice to Appear because Petitioner was present in the United States without being admitted or

paroled, pursuant to § 212(a)(6)(A)(i) of the INA, 8 U.S.C. § 1182 (a)(6)(A)(i). On March 6, 1999, Petitioner, through counsel, admitted the factual allegations in the Notice to Appear and conceded removability. On March 18, 2003, the IJ denied Petitioner's application for asylum, withholding of removal, and voluntary departure. The IJ's decision was based on what the IJ described as critical inconsistencies in Petitioner's testimony, his application, and prior sworn statements that dealt with material elements of Petitioner's claim. The IJ further found that even if Petitioner was credible, Petitioner had still failed to establish past persecution or a well-founded fear of future persecution. Petitioner appealed the IJ's decision to the BIA. On June 24, 2004, the BIA affirmed the IJ's decision. Petitioner then filed this timely petition for review.

In order to understand the IJ's reasoning, it is important to consider the facts as presented separately by Petitioner in his affidavit, I-589 asylum application, and in the hearing before the IJ.

## A. Petitioner's Affidavit

Petitioner was born in Algiers, Algeria in 1968. Petitioner's uncle and nephew were killed in the massacre at Baraki, Algeria in September 1997. Petitioner's house was destroyed using hand grenades and bombs by the Algerian military. Petitioner believes that these acts were carried out because Petitioner refused to join the Algerian military. Petitioner was of military draft age when he fled Algeria, but claims he declined to join. Petitioner says he is suspected by the Algerian government of being affiliated with the Armed Islamic Group ("GIA") or the Islamic Salvation front ("FIS"). Petitioner does not want to join the military "due to the violent and unjust actions it takes against civilian men, women and children." Petitioner stated that he believes that "the Algerian military uses the excuse of 'suspected terrorist involvement' to justify its unreasonable and abusive

2

tactics, which include rape, summary executions, and wide-spread destruction of homes." Petitioner indicated that a friend that worked for an Algerian bank was killed, most likely by the GIA. Petitioner believes that this friend was killed by the GIA because banks are nationally owned by the Algerian government, and therefore employees of banks are considered to be agents of the government and are targeted by the GIA. Petitioner further claimed that a friend of his who had lived in the United Kingdom since 1993 returned to Algeria recently, and was beaten and jailed.

## B. Petitioner's I-589

Petitioner filed an I-589 asylum application with the INS on October 9, 1997. Petitioner prepared his asylum application with the assistance of counsel. Petitioner's application stated that he was applying for asylum because he "would be persecuted for avoiding military service." Petitioner indicated that "Algeria is in the grip of an Islamic revolution, and both sides commit human rights abuses. If I returned to join the security forces, I would likely be ordered to be involved in counterinsurgency operations and be told to harm others." Petitioner's responses were primarily typed, but there was also a handwritten note in the same section (presumably from the immigration officer), stating that Petitioner "opposes military because Moslem not supposed to kill each other and govt won't negotiate with Islam."

Petitioner's application stated that he left Algeria because he "would be arrested and persecuted, or forced to join the security forces." Petitioner's application indicated that he was not associated with any organization or group in his home country. Petitioner also indicated that in November 1994, he was ordered to appear for military service or face persecution.

3

## C. Hearing Before the Immigration Judge

During testimony, Petitioner stated that the penalty for not joining the army was imprisonment, torture and perhaps death. Petitioner testified that a term of imprisonment would be served in a desert camp, where prisoners live in tents and are given a hard time. Petitioner testified that he learned this information from telephone conversations that he had with a friend after he [Petitioner] entered the U.S. According to Petitioner, this friend heard about the camps from letters that the friend received from an imprisoned cousin.

Petitioner testified that he had been blacklisted and denied a passport because the government of Algeria suspected that he was affiliated with FIS, an opposition group opposed to the Algerian government, that Petitioner claims he joined in 1992. Petitioner testified that his house was "exploded," and that one of the reasons might have been his affiliation with this group. Petitioner claimed that while campaigning for the group in 1995 and 1996, the GIA had threatened his life. According to Petitioner, the GIA was attempting to establish itself as a new political party, and its purported representative approached Petitioner and told him that either he was with the GIA or against the GIA. Petitioner stated that he did not want to be associated with the GIA because it was a terrorist group.

Petitioner admitted that his house was one of about 300 houses that was destroyed in 1997. Petitioner was in the U.S. at the time that the explosion occurred that destroyed his house, but Petitioner claims that he heard about the explosion from his brother, who heard about it from someone else.

4

Petitioner also testified that his life had been threatened by the GIA twice. Petitioner says that he was threatened once in the summer of 1995 by three people who wanted Petitioner to join the GIA. Petitioner claims that the incident was witnessed by his brother. Petitioner did not provide an affidavit from his brother. Petitioner testified that the second incident occurred in the winter of 1996, when he was threatened by 5 people claiming to be with the GIA. Petitioner testified that his grandfather witnessed this incident, but again did not provide an affidavit.

Ambassador Charles Dunbar testified at the hearing on Petitioner's behalf and provided background information about the conditions in Algeria, including the 1991 election, which was won by the FIS. Ambassador Dunbar testified that after the elections, the Algerian government outlawed the FIS and imprisoned supporters. According to Ambassador Dunbar, the extremist group GIA was formed after the election to take up arms against the government. Ambassador Dunbar admitted that he had no direct knowledge of instances where the army was involved in massacres. Ambassador Dunbar stated that the Algerian government did utilize the army to jail people for the support of the "Islamist" movement, but conceded that he did not believe that the Algerian government was after Petitioner for his involvement with the FIS. Ambassador Dunbar also stated that Algerian prisoners were sent to camps, but that he had no specific knowledge of the punishment for failure to enter the draft.

Petitioner also submitted an expert affidavit from Khalid Duran, an author and scholar of Algerian politics, history and culture. Duran stated (in regard to Petitioner's case), "Although I have no way of verifying the particulars of this case, I can, however, state categorically that his story

is typical of what is happening in Algeria. I have heard similar cases and there is nothing in his statements that surprises me or appears unbelievable."

Duran's affidavit provided support for Petitioner's claim, stating in particular that, "[a]nyone refusing to do the military service is of course suspected of sympathies for the insurgents and is dealt with severely . . . an Algerian unwilling to do the compulsory military service has no other choice but to flee his country." Duran further stated, "The applicant cannot return to Algeria. In the eyes of the Islamist insurgents he is now worse than before, because in the meantime he has been exposed to the corrupting influences of the most evil society on earth, in Great Satan's den."

## II. DISCUSSION

### A. Standard of Review

Where the Board affirmed a decision of the immigration judge ("IJ") without writing a separate opinion, this Court directly reviews the IJ's decision. *Denko v. INS*, 351 F.3d 717, 726 (6th Cir. 2003); 8 C.F.R. § 1003.1 (e)(4). The Attorney General's legal conclusions in the course of adjudicating an application for asylum and withholding of removal under INA § 208; 8 U.S.C. § 1158 and 8 U.S.C. § 1231(b)(3) are reviewed *de novo*, but his reasonable construction of the immigration statute is entitled to deference. *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999) (stating "judicial deference to the Executive Branch is especially appropriate in the immigration context where officials 'exercise especially sensitive political functions that implicate questions of foreign relations'").

Factual findings underlying the denial of asylum must be upheld on review unless "any reasonable adjudicator would be compelled to conclude the contrary." 8 U.S.C. § 1252 (b)(4)(B).

The appropriate inquiry is whether the applicable evidence "was such that a reasonable fact finder would have to conclude that the requisite fear of persecution existed." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992). Adverse credibility findings are under the substantial evidence standard. *Yu v. Ashcroft*, 364 F.3d 700, 703 (6th Cir. 2004). *See also Wang v. INS*, 352 F.3d 1250 (9th Cir. 2003); *Farah v. Ashcroft*, 348 F.3d 1153 (9th Cir. 2003).

## B. Analysis

The IJ denied Petitioner's claim both on the grounds of an adverse credibility determination and because she found that Petitioner had failed to establish a well founded fear of future persecution. For the following reason, we deny the petition on both grounds.

1.

The IJ's adverse credibility determination was supported by substantial evidence. Determinations as to credibility are findings of fact, which in political asylum cases, are reviewed under the substantial evidence standard. *Ndiaye v. Gonzales*, 2005 WL 2323164 (6th Cir. Sept. 23, 2005) (unpublished) (citing *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004). A finding of lack of credibility may be reversed only if "any reasonable adjudicator would be compelled to conclude the contrary." 8 U.S.C. 1252 (b)(4)(B). There is a difference between major and minor inconsistencies. *Huang v. Ashcroft*, 113 Fed. Appx. 695, 700 (6th Cir. 2004) (citing *Yu*, 364 F.3d at 703-04). The essential element to a finding of a lack of credibility is that the discrepancies must go to the heart of the petitioner's claim. *See Daneshvar v. Ashcroft*, 355 F.3d 615, 623 (6th Cir. 2004). In contrast, minor inconsistencies reveal nothing about petitioner's persecution and therefore

are an inadequate basis for an adverse credibility finding, though they can give supplemental support to an adverse credibility finding premised on other grounds. *Id*.

The IJ's adverse credibility determination is supported by substantial evidence. The IJ found that Petitioner's credibility before the court was compromised in that "his testimony and his applications, and indeed the prior sworn statements which he has submitted to the Court, are inconsistent." The IJ further found that the inconsistencies were critical, going to material elements, of the Petitioner's claim. Moreover, the IJ was suspicious of the fact that Petitioner's application for asylum omitted events and details of his claims of persecution, which were provided to the court in hearing testimony, but for which Petitioner failed to provide convincing explanations.

The IJ's first concern was the fact that Petitioner failed to mention his affiliation with the FIS in his asylum application. Question 3 of the I-589 specifically asks, "Have you or any member of your family ever belonged to or been associated with any organization or groups in your home country (i.e. a political party, student group, union, religious organization, military or para-military group, civil patrol, guerilla organization, ethnic group, human rights group or the press)." Petitioner answered, "no" to this question. The IJ noted that Petitioner also made no reference to this affiliation in his later filed affidavit. However, Petitioner testified during his hearing that he "joined the Islamic Salvation Front in 1992," and relies upon his affiliation with that group as one of his grounds for asylum in his brief to this Court.

The IJ was also troubled by the fact that Petitioner was inconsistent about the circumstances surrounding the destruction of his home. Petitioner claims that his home was one of 300 houses destroyed in 1997 by government special forces. The IJ took issue with the fact that Petitioner

claimed in his 1999 affidavit that his home was targeted because of his unwillingness to join the military, but testified during the hearing that his home was destroyed because of his support for the FIS. But yet, Petitioner submitted into evidence a document from the Algerian National Guard, stating that Petitioner was a victim of brutal, armed aggression during the month of November 1997 when a military operation against terrorism occurred in the area where Petitioner lived, and that Petitioner's home was destroyed by hand grenades and bombs of terrorists.

The final major inconsistency relied upon by the IJ was the fact that Petitioner claimed at his hearing that he had been threatened on two specific occasions, in 1995 and 1996, by representatives of GIA. Again the IJ noted that Petitioner made no mention of these threats either during his application for asylum, nor during his original interview with the immigration officer. The IJ further noted that Petitioner claims that his grandfather was present for one incident and his brother for another, but Petitioner failed to provide affidavits or corroborating evidence from either of these individuals.

We believe that the inconsistencies relied upon by the IJ taken as a whole, do go to the heart of the application for asylum, and therefore we decline to disturb the IJ's adverse credibility determination. Two of the inconsistencies, taken individually, would be enough to raise serious questions about Petitioner's credibility. The omission of the affiliation with FIS, and the claim that Petitioner was threatened on two separate occasions by GIA representatives are crucial facts that go directly to the heart of Petitioner's claim for asylum.

In particular, the fact that Petitioner partly relies on his affiliation with the FIS as one of his grounds for asylum, but never mentioned it on his I-589 asylum application constitutes a major

inconsistency that goes to the overall credibility of his claim. The same is true of the threats from the GIA. Petitioner mentioned in his asylum application and his affidavit the fact that friends had been harassed by the GIA. It therefore seems incredible that Petitioner would fail to mention that he himself had been threatened or harassed by the group. If true, these facts would provide specific concrete evidence to bolster Petitioner's claim. We also find it troubling that Petitioner would have overlooked these significant facts, particularly given that he was assisted by counsel at all stages of this asylum process.

Taken as a whole, the inconsistencies do go to the heart of Plaintiff's claim and therefore the IJ's adverse credibility finding was supported by substantial evidence.

2.

The IJ's determination that Petitioner did not establish a well-founded fear of future persecution is also supported by substantial evidence. A deportable alien is eligible to seek asylum at the discretion of the Attorney General upon proof of a "well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1158 (b); 8 U.S.C. § 1101 (a)(42)(A); *Daneshvar*, 355 F.3d at 623.

In order to demonstrate eligibility on the basis of a well-founded fear of future persecution, an applicant must establish that he or she has a fear of persecution in his or her country, that there is a reasonable possibility of suffering such persecution if he or she were to return to that country, and that he or she is unable or unwilling to return to that country because of such fear. *Id.* (quoting 8 C.F.R. 1208.13(b)(2)). A well-founded fear must be both subjectively genuine and objectively reasonable. *Daneshvar*, 355 F.3d at 624. An applicant must therefore "actually fear that he will be

persecuted upon return to his country, and he must present evidence establishing an 'objective situation' under which his fear can be deemed reasonable." *Id.* (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 430-31 (1987)). "The applicant need not, however, show that he probably will be persecuted if he is deported; [o]ne can certainly have a well-founded fear of an event happening when there is less than a 50 % chance of the occurrence taking place." *Id.* "This Court has held that 'persecution' within the meaning of 8 U.S.C. § 1101 (a)(42)(A) requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty." *Id.*

The evidence offered by Petitioner to support his asylum claim is that: (1) he fled Algeria after failing to appear for military service out of fear of punishment; (2) he does not want to be associated with the military or the GIA because they engage in inhuman conduct; and (3) his house was one of 300 destroyed either because of his failure to join the military and/or his involvement or perceived involvement with the FIS. These claims do not establish the kind of particularized threat of severe harm that would support a well-founded fear of future persecution.

While it is true that "conscientious objection to military service can form the basis for an asylum claim where the alien would be required to engage in inhuman conduct if he were to serve in the military," *Ramos-Vasquez v. INS*, 57 F.3d 857, 863 (9th Cir. 1995), Petitioner has failed to establish either that he would in fact be required to engage in such inhumane conduct, or that he will be persecuted for failing to join the military. The IJ concluded, and we agree, that Petitioner has not met his burden of establishing that the military, upon whose actions Petitioner's claim is based, has engaged in the type of actions which is condemned by the international community.

11

First of all, Petitioner's experts failed to establish that Petitioner would in fact be required to engage in inhumane conduct if Petitioner were required to serve in the military. Petitioner's expert on Algerian politics, Khalid Duran, stated, "Allegations that some of the worst massacres were committed by the military in order to impute this barbarism to the insurgents have most turned out to be wrong." (J.A. at 102) According to Petitioner's other expert, Ambassador Dunbar, "it is very difficult to say exactly when the Algerian army is responsible for a massacre or when the Algerian army is responding to a massacre." (J.A. at 264) Ambassador Dunbar also characterized the allegations that the military killed villagers as "stories."

Furthermore, even if Petitioner had established that he would be required to engage in inhumane conduct, Petitioner has failed to present evidence that he would be persecuted for failing to join the military. Petitioner testified that he does not want to report for the military because he would be subjected to terrible punishment, including being imprisoned in the desert, where he might be buried up to his neck in sand. Petitioner claims that he heard about this particular punishment from a friend's cousin who was sent to the desert and tortured for not joining the army. Petitioner admitted that this information came from letters that were sent to the friend by the cousin, but that he [Petitioner] himself had never read the letters. And while Petitioner's expert, Khalid Duran, stated in his affidavit that anyone refusing to do military service is suspected of sympathies with insurgents, and that some such dissenters have been executed in the form of extrajudicial killings, Duran failed to offer specific instances of such extra judicial killings, and admitted that he could not verify the particulars of Petitioner's case.

12

As Petitioner has failed to establish that he would be persecuted for refusing military service, and Petitioner's own experts failed to demonstrate that Petitioner would be forced to commit inhumane acts, we are not compelled to find in Petitioner's favor. Therefore, the IJ's findings must be affirmed.

The IJ further determined that Petitioner failed to provide enough evidence to establish that he was in any danger from the GIA. He merely stated that he wishes to avoid affiliation with the group, which again does not give rise to an asylum claim. As stated by the IJ, "generalized civil strife does not give rise to a claim for asylum."

We therefore find that substantial evidence supports the IJ's determination that Petitioner's claims do not amount to a well founded fear of future persecution.

3.

The IJ also properly determined that Petitioner does not qualify for withholding of removal. Eight U.S.C. § 1253 (h) provides that "[t]he Attorney General shall not deport or return any alien . . . to any country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion." An application seeking withholding of deportation faces a more stringent burden of proof than one for asylum. *Mikhailevitch*, 146 F.3d at 391 (quoting *Cardoza-Fonseca*, 480 U.S. at 431-32).

In order to qualify for withholding of removal, Petitioner must demonstrate that there is a clear probability that he would be subject to persecution if he were to return to Algeria. *See Ivezaj v. INS*, 84 F.3d 215, 221 (6th Cir. 1996). Petitioner has failed to articulate a particularized threat

13

of danger that he will face if returned to his home country. It therefore follows that Petitioner has not established that there is a clear probability that he would be subject to persecution if returned to Algeria. As such, Petitioner is not entitled to withholding of deportation.

## III. CONCLUSION

In conclusion, we do not believe that the evidence in the record compels a different conclusion from that reached by the IJ, and therefore we **DENY** the petition for review.

**Rogers, Circuit Judge, concurring.** In my view, because substantial evidence supports the Immigration Judge's findings that Beleh will not be required to engage in inhuman acts if he serves in the military, it is not necessary to consider whether the Immigration Judge properly determined that Beleh does not face disproportionately severe punishment for evading military service.