Peter Gabriel John McMULLEN, Petitioner,

v.

IMMIGRATION AND NATURALIZATION SERVICE, Respondent.

No. 84–7468.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 11, 1985.

Decided April 25, 1986.

Bill Ong Hing, Nancy Howard, Lynn Sonfield, Terry J. Helbrush, Simmons & Ungar, San Francisco, Cal., for petitioner.

Daniel E. Fromstein, Joan E. Smiley, Washington, D.C., for respondent.

Before GOODWIN and WALLACE, Circuit Judges, and STEPHENS,* District Judge.

WALLACE, Circuit Judge:

McMullen petitions for review of the Board of Immigration Appeals' (BIA) order finding him ineligible for asylum or withholding of deportation under 8 U.S.C. §§ 1101(a)(42)(A), 1253(h)(1), and 1253(h)(2)(C). We have jurisdiction under 8 U.S.C. § 1105a, and we deny the petition.

## I

The underlying facts of this dispute were related in *McMullen v. INS*, 658 F.2d 1312, 1314–15 (9th Cir.1981) (*McMullen I*). We will discuss only the particular facts relevant to this appeal.

In January 1972, McMullen deserted the British Army and joined the Provisional Irish Republican Army (the PIRA), an offshoot of the paramilitary Irish Republican Army. He participated in a bombing by

---

* Honorable Albert Lee Stephens, Jr., United States District Judge, Central District of California, sitting by designation.

the PIRA of the Palace Barracks, where he had been stationed. The object of the bombing was to prevent a planned British Army confrontation with Catholic demonstrators, which ultimately took place on what became known as Bloody Sunday. McMullen participated actively in the PIRA from 1972 to 1974, including involvement with another bombing at Claro Barracks, Ripon, North Yorkshire, in 1974. In September 1974, he formally resigned from the PIRA because he, as he stated, felt that the group had become extremist, employed too much terrorist violence and did not represent the Irish populace. On November 23, 1974, the Republic of Ireland police (Garda) arrested McMullen. The government charged him with membership in the PIRA, sedition (incitement to riot), and possession of a gun. After conviction on these charges, he was imprisoned for three years at Portalaise Prison. McMullen was held in the "maverick wing" of the prison, which housed "nonaligned" prisoners, who were segregated from PIRA-member prisoners.

In March 1977, the government released McMullen from Portalaise. He was approached by a PIRA member, who requested him to assist the PIRA, and McMullen refused. After several instances of PIRA intimidation, McMullen again began to participate in PIRA activities. He housed PIRA members in his home on occasion, trained PIRA members, and coordinated illegal arms shipments from the United States to Northern Ireland for use by PIRA terrorists. In 1978, the PIRA ordered McMullen to plan and execute the kidnapping for ransom of a New York bar owner, Daniel Flannigan. He refused to obey this order. Shortly thereafter, a PIRA "court of inquiry" reviewed this refusal. A friend of McMullen's, who he described as a prominent member of the PIRA, visited him ten days later and warned him that "there was a hit squad being set up" to murder him and "that the safest thing was to get away."

Early in 1978, McMullen procured a false visa using the name of Kevin O'Shaughnessy, and fled to the United States. He contacted the Bureau of Alcohol, Tobacco and Firearms, hoping to obtain asylum in exchange for knowledge about PIRA activities. He cooperated with the Bureau and with Scotland Yard investigators in the United States.

In July of 1978, the United Kingdom sought McMullen's extradition to face criminal charges stemming from the 1974 Claro Barracks bombing in England. His deportation was held in abeyance during the extradition proceedings. On May 11, 1979, a United States magistrate in San Francisco ruled that McMullen could not be extradited to England because of the provisions of the Extradition Treaty then in force between the United States and the United Kingdom.

At his subsequent deportation hearing, McMullen testified that the PIRA was aware of his cooperation with the authorities in the United States and that he was considered a traitor who should be killed. In support of his position, he submitted over 100 pages of exhibits documenting PIRA terrorist activities.

The Immigration Judge (IJ) found that McMullen was not deportable because "the Government of the Republic of Ireland is unable to control the activities of the PIRA and if [he] were to be returned to that country he would suffer persecution within the meaning of the [United Nations] Convention Protocol and Section 243(h) of 8 U.S.C. § 1253(h)." The IJ also held that McMullen was not a security risk to the United States and that deportation should be withheld.

On October 1, 1980, the BIA reversed the IJ, finding that McMullen had not shown a sufficient likelihood that he would suffer persecution upon deportation. On appeal, we reversed, finding that McMullen had demonstrated an adequate showing of probable persecution to avoid deportation. *See McMullen I,* 658 F.2d at 1317–19. We did not decide whether McMullen's break from the PIRA constituted a political belief within the meaning of section 243(h) of the Immigration and Naturalization Act, 8

U.S.C. § 1253(h) (the Act), whether McMullen represented a danger to the United States, or whether McMullen would be persecuted by the Garda. *Id.* at 1319 & n. 6.

In light of the outcome of the appeal to this court, the parties agreed to the BIA's reconsideration of its October 1, 1980, decision. *See* 8 C.F.R. § 3.2 (1985). The BIA again sustained its reversal of the IJ's determination that McMullen should not be deported. The BIA found that McMullen's claimed persecution was not based on political opinion or on any other enumerated ground for relief in 8 U.S.C. § 1253(h)(1).[1]

The BIA also found that McMullen was statutorily ineligible for asylum as a refugee under section 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A), which excludes from refugee status "any person who ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion." *See also* 8 U.S.C. § 1253(h)(2)(A) (withholding of deportation unavailable to any alien who fits these categories). This decision was based upon McMullen's active membership and leadership, including his training of terrorists and gun-running, by which he knowingly furthered PIRA's campaign of terrorist atrocities. The BIA also found McMullen statutorily ineligible for withholding of deportation under 8 U.S.C. § 1253(h)(2)(C) based on the same activities. Finally, the BIA determined it would deny asylum as a matter of its discretion.

## II

We first consider whether the BIA's finding that McMullen was ineligible for withholding of deportation under section 243(h)(2)(C) on the basis of "serious reasons for considering that [McMullen] has committed a serious nonpolitical crime" is supported by substantial evidence. If so, we will not need to address the other issues presented to us.

### A.

Congress added subsection (h) to section 243 of the Act as part of the Refugee Act of 1980, Pub.L. No. 96–212, § 203(e), 94 Stat. 107. The legislative history on this particular aspect of the Refugee Act is sparse, and is particularly sparse with respect to subsection (h)(2). The Senate Report speaks only of this subsection as a "conforming amendment" to the Act, and to the extent it describes the operation of the subsection, it mentions only the mandatory withholding of deportation provision of subsection (h)(1). *See* S.Rep. No. 256, 96th Cong., 1st Sess. 17, *reprinted in* 1980 U.S.Code Cong. & Ad.News 141, 157. The conferees, however, were somewhat more explicit. They observed that the House amendment contained the four exceptions in subsection (h)(2), and that "[t]he Conference substitute adopts the House provision with the understanding that it is based directly upon the language of the Protocol and it is intended that the provision be construed consistent with the Protocol." Conf.Rep. No. 781, 96th Cong., 2d Sess. 20, *reprinted in* 1980 U.S.Code Cong. & Ad. News 160, 161. The Protocol to which the conferees referred is the Protocol Relating

---

1. Section 243(h) of the Act, 8 U.S.C. § 1253(h), provides:

   (1) The Attorney General shall not deport or return any alien (other than an alien described in section 1251(a)(19) of this title) to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion.

   (2) Paragraph (1) shall not apply to any alien if the Attorney General determines that—

   (A) the alien ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion;

   (B) the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States;

   (C) there are serious reasons for considering that the alien has committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States; or

   (D) there are reasonable grounds for regarding the alien as a danger to the security of the United States.

to the Status of Refugees, 606 U.N.T.S. 267 (1967) (Protocol), which incorporates by reference the Convention Relating to the Status of Refugees, 189 U.N.T.S. 150 (1951) (Convention). The United States acceded to the Protocol in 1968. *See* Convention and Protocol Relating to the Status of Refugees, 19 U.S.T. 6223, T.I.A.S. No. 6577 (1968).

Since the only clear signal that can be gleaned from the legislative history is that Congress intended the nonpolitical crimes exception to withholding of deportation to be consistent with the Convention and Protocol, we must look first to those documents for guidance. The Protocol itself does not add any new substantive provisions to the Convention with regard to this issue. *See* Protocol, 19 U.S.T. at 6225–29. The Convention excludes from its protections

> [A]ny person with respect to whom there are serious reasons for considering that:
>
> (a) he has committed a crime against peace, a war crime, or a crime against humanity . . .;
>
> (b) he has committed a serious non-political crime outside the country of refuge prior to his admission to that country as a refugee;
>
> (c) he has been guilty of acts contrary to the purposes and principles of the United Nations.

Convention, art. 1(F)(a)–(c), 19 U.S.T. at 6263–64. Thus, under the Convention, such persons are not considered refugees, and are subject to deportation, or "refoulement." *See* G. Goodwin-Gill, *The Refugee in International Law* 58–65 (1983).

▪ Under this standard, a "serious nonpolitical crime" is a crime that was not committed out of "genuine political motives," was not directed toward the "modification of the political organization or . . . structure of the state," and in which there is no direct, "causal link between the crime committed and its alleged political purpose and object." *Id.* at 60–61. In addition, even if the preceding standards are met, a crime should be considered a serious nonpolitical crime if the act is disproportionate to

the objective, or if it is "of an atrocious or barbarous nature." *Id.*

We have found little assistance from prior cases to help us in the application of this standard. The nearest analogy to this principle appears to be the "political offense" exception to extradition. Under this doctrine, the application of which usually turns on the precise language of the extradition treaty, a person may not be extradited to face prosecution for crimes committed in furtherance of a political uprising, movement or rebellion in the country in which such occurrences are taking place. *See, e.g., Ornelas v. Ruiz*, 161 U.S. 502, 509–12, 16 S.Ct. 689, 691–92, 40 L.Ed. 787 (1896) (*Ornelas*); *Quinn v. Robinson*, 783 F.2d 776, 782–83, 790–91 (9th Cir.1986) (*Quinn*); *Eain v. Wilkes*, 641 F.2d 504, 512–13 (7th Cir.) (*Eain*), *cert. denied*, 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981); *Escobedo v. United States*, 623 F.2d 1098, 1104 (5th Cir.), *cert. denied*, 449 U.S. 1036, 101 S.Ct. 612, 66 L.Ed.2d 497 (1980) *and* 450 U.S. 922, 101 S.Ct. 1371, 67 L.Ed.2d 350 (1981); *Sindona v. Grant*, 619 F.2d 167, 173–76 (2d Cir.1980) (*Sindona*); *Garcia-Guillern v. United States*, 450 F.2d 1189, 1192 (5th Cir.1971) (*Garcia-Guillern*), *cert. denied*, 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1972). The Supreme Court enumerated several factors that may be relevant in determining the proper characterization of the conduct at issue, depending on the circumstances under which the questioned action was undertaken, including "the character of the foray, the mode of attack, the persons killed or captured, and the kind of property taken or destroyed," in order to determine whether the action was part of "a movement in aid of a political revolt, an insurrection or a civil war." *See Ornelas*, 161 U.S. at 511, 16 S.Ct. at 692.

The BIA found that McMullen's alleged participation in PIRA activities directed at civilians, and his other actions, including the training of others for terrorist operations and his own participation in coordinating arms shipments and bombings, were not within the political offense exception:

[McMullen's] involvement in the terrorist use of explosives and his participation in the PIRA's campaign of violence randomly directed against civilians represent acts of an atrocious nature out of proportion to the political goal of achieving a unified Ireland and are not, therefore, within the political offense exception.

McMullen argues that the BIA's weighing of the nature of his alleged offenses against the political ends he sought to obtain is impermissible under the political offense doctrine as it has been developed in extradition cases. *See Quinn,* 783 F.2d at 805, 817 (dicta). He argues that the same standard for determining whether a particular act, normally a common law crime, is a political offense in extradition cases should be applied when determining whether withholding of deportation is mandated under section 243(h)(2)(C). Under his proposed standard, an act would be considered a political offense when (1) there was an insurrection or rebellion at the time the criminal acts were committed, and (2) the criminal acts were incident to or in furtherance of that insurrection or rebellion. This formulation is consistent with the traditional definition of a political offense for extradition purposes. *See In re Castioni,* 1 Q.B. 149, 155–56 (1890). Thus, McMullen argues, his admitted participation in the bombing of two military barracks is clearly within the category of a political offense.

■ We conclude that McMullen's analysis puts too much weight on the definition of political offenses in extradition cases because, although it may serve as a guide, the definition does not control our analysis of political offenses under section 243(h)(2)(C). When extradition is the issue, the attempt to remove an individual from the requested country is initiated at the specific request of another sovereign, whom the individual contends is seeking to extradite him solely in order to prosecute him for his political beliefs. Thus, the analysis in an extradition case turns on the language of the particular treaty, while the political offense analysis in withholding of deportation cases turns on a single standard—the Convention and Protocol.

In addition, in contrast to extradition, deportation is a matter solely between the United States government and the individual seeking withholding of deportation. No other sovereign is involved. The question, therefore, is whether the individual has committed a criminal act that puts him outside the statutory provisions for withholding of deportation under section 243, an act which Congress has determined makes the individual an "undesirable" in the eyes of the law. Moreover, the individual need not be deported to any country specifically seeking to extradite him; all the United States seeks is to expel him from its *own* borders. Thus, we find ourselves unencumbered by the concerns we expressed in *Quinn,* 783 F.2d at 804–05 (dicta), that we should be careful not to interfere with political processes in other cultures by *extraditing* individuals merely because they have committed acts that deeply offend civilized notions of decency and morality. *Id.* at 793 n. 11. When we *deport* an individual we are not "interfering with any *internal* struggle" of another nation. *Id.* at 806 (dicta) (emphasis in original).

It appears to us that the BIA's interpretation of the statute is consistent with the Convention, and thus consistent with congressional intent. A balancing approach including consideration of the offense's "proportionality" to its objective and its degree of atrocity makes good sense. *See* G. Goodwin-Gill, *supra,* at 61. Moreover, this approach better recognizes the type of crime involved in this and most such cases. There is a distinction between "pure" political crimes, such as sedition, treason, and espionage, and "relative" political crimes, crimes that have both common law criminal aspects and political aspects. *See Eain,* 641 F.2d at 512. An approach that considers the proportionality and atrocity of a particular course of conduct is better suited to the analysis of "relative" political offenses under the Convention and Protocol.

■ Essentially, McMullen's proposed test truncates even this two-pronged analy-

sis into a single objective determination whether an insurrection or revolution is in progress. Beyond that, he would focus on the political motives of the individual. We reject the argument that places the determination of withholding deportation on the alien's state of mind. The law focuses on the circumstances surrounding the acts, and not on the alien's state of mind. *See, e.g., Ornelas,* 161 U.S. at 509–12, 16 S.Ct. at 691–92; *Eain,* 641 F.2d at 520–21; *Garcia-Guillern,* 450 F.2d at 1192. Of course, for a criminal act to be "political," the individual must have been motivated by political reasons. G. Goodwin-Gill, *supra,* at 60. However, "motivation is not itself determinative of the political character of any given act." *Eain,* 641 F.2d at 520. The critical issue is "whether there is a close and direct causal link between the crime committed and its alleged political purpose and object." G. Goodwin-Gill, *supra,* at 61; *accord Eain,* 641 F.2d at 520–23; *Garcia-Guillern,* 450 F.2d at 1192. This link, when balanced with proportionality and atrocity, must warrant the protection afforded a "political" crime. This doctrine was established to protect acts that are directed at the State itself, and not to protect every criminal act that in some sense contributes to the political goal of those committing it. *See Quinn,* 783 F.2d at 798; *Eain,* 641 F.2d at 520–23.

■ In addition, we reject McMullen's argument that we should find him eligible for withholding of deportation because the magistrate in his extradition proceeding found his acts to be "political offenses" under the treaty. That a magistrate earlier found McMullen's acts to be political offenses for purposes of denying extradition does not affect the BIA's contrary finding under section 243(h)(2)(C) because extradition determinations have no res judicata effect in subsequent judicial proceedings. *See Quinn,* 783 F.2d at 786 n. 3, 814 n. 36; *Hooker v. Klein,* 573 F.2d 1360, 1366–68 (9th Cir.), *cert. denied,* 439 U.S. 932, 99 S.Ct. 323, 58 L.Ed.2d 327 (1978).

### B.

■ We now must decide whether the crimes were serious and nonpolitical. The crimes that the BIA found nonpolitical, and thus beyond the bounds of statutory protection, were terrorist activities directed at an unprotected civilian population, including "indiscriminate bombing campaigns, ... murder, torture, and maiming of innocent civilians who disagreed with the PIRA's objectives and methods." The record, much of it supplied by McMullen, contains substantial evidence supporting the inference that the PIRA committed these acts. Such acts are beyond the pale of a protectable "political offense." These actions were directed solely at bringing about social chaos, with the eventual demise of the State intended only as an indirect result. Indeed, arson, murder, and armed robbery (a major financing tool for the PIRA), are clearly the sort of crimes contemplated by the Convention as both "serious" and "nonpolitical." *See* G. Goodwin-Gill, *supra,* at 62.

The problem, of course, is that the PIRA is unquestionably a "terrorist" organization, and these activities were part of their overall plan to rid Northern Ireland of the British. Terrorism does not fit easily into the complex rubric of international law, *see Eain,* 641 F.2d at 520, and it is difficult to distinguish meaningfully between one obviously terrorist act and another. However, there is one relevant distinction that has maintained legal force for many years, and which applies in this case. There is a meaningful distinction between terrorist acts directed at the military or official agencies of the state, and random acts of violence against ordinary citizens that are intended only "to promote social chaos." *Id.* at 519. The distinction between acts against ordinary civilians and official instrumentalities has been extant in the common law since *In re Meunier,* 2 Q.B. 415 (1894). *See also Eain,* 641 F.2d at 521 (discussing *Meunier* ).

In the context of extradition, the Seventh Circuit concluded that indiscriminate terrorist acts directed at civilians are not "po-

litical offenses." *See id.* at 520–21. We recently questioned whether such analysis is proper in extradition cases. *See Quinn,* 783 F.2d at 808 (dicta). However, we conclude that the rationale applies well to the "serious nonpolitical crimes" exception to section 243(h). If acts of violence directed at ordinary citizens were deemed "political crimes" for the purposes of this subsection, then the Attorney General would be *required* to withhold deportation of the perpetrators. As the Seventh Circuit observed, if such were the law:

> [N]othing would prevent an influx of terrorists seeking a safe haven in America. Those terrorists who flee to this country would avoid having to answer to anyone anywhere for their crimes. The law is not so utterly absurd. Terrorists who have committed barbarous acts elsewhere would be able to flee to the United States and live in our neighborhoods and walk our streets forever free from any accountability for their acts. We do not need them in our society. We have enough of our own domestic criminal violence with which to contend without im-

porting and harboring with open arms the worst that other countries have to export. We recognize the validity and usefulness of the political offense exception, but it should be applied with care lest our country become a social jungle and an encouragement to terrorists everywhere.

*Eain,* 641 F.2d at 520. We conclude, therefore, that the PIRA's random acts of violence against the ordinary citizens of Northern Ireland and elsewhere, exhaustively documented in the record, are not sufficiently linked to their political objective and, by virtue of their primary targets, so barbarous, atrocious, and disproportionate to their political objectives that they constitute "serious nonpolitical crimes" for purposes of section 243(h)(2)(C) and the Convention.

### C.

■ We must next consider whether substantial evidence supports the BIA's inference that there are "serious reasons" to believe that McMullen committed these crimes.[2] *See McMullen I,* 658 F.2d at 1316.

**2.** We recognize that in *Artukovic v. INS,* 693 F.2d 894, 898–99 (9th Cir.1982), we required the government to show by clear and convincing evidence that Artukovic was a Nazi war criminal in order to revoke a stay of deportation under section 243(h) prior to the Refugee Act of 1980 amendments. The change in the statutory language, however, requires a change in the level of evidence necessary to support refusal of withholding.

In *Artukovic,* we applied the Act of Oct. 30, 1978, Pub.L. No. 95–549, §§ 103–104, 92 Stat. 2065–66, which amended section 243(h) to authorize the Attorney General to deport an alien who participated in Nazi war crimes. Congress intended the "clear and convincing evidence" standard to apply to finding personal culpability under this section. H.R.Rep. No. 1452, 95th Cong., 2d Sess. 13, *reprinted in* 1978 U.S.Code Cong. & Ad.News 4700, 4712; *see Artukovic,* 693 F.2d at 898–99.

The Refugee Act of 1980 altered this framework in two ways. First, although it retained the "ordered, incited, assisted, or otherwise participated in ... persecution" language, it eliminated the references to Nazi Germany, thus expanding the universe of such undesirables. 8 U.S.C. § 1253(h)(2)(A). Second, the Refugee Act of 1980 added three additional categories of undesirables, including the serious nonpolitical

criminal category at issue in this case. 8 U.S.C. § 1253(h)(2)(B)–(D).

There is a significant difference between category A, the successor to the language interpreted in *Artukovic,* and category C. Category A applies "if the Attorney General determines that —(A) the alien ordered, incited, assisted, or otherwise persecuted any person...." Category C, however, applies "if the Attorney General determines that—(C) there are *serious reasons for considering* that the alien has committed a serious nonpolitical crime...." (Emphasis added.) A finding that there are "serious reasons" to believe the alien committed a serious nonpolitical crime is far less stringent than a determination that the alien actually "ordered, incited, assisted, or otherwise participated in ... persecution."

While we express no opinion as to whether the clear and convincing evidence standard continues to apply to section 243(h)(2)(A) after the Refugee Act, we conclude that it makes no sense to require the Attorney General to show by "clear and convincing evidence" that there are "serious reasons" to believe such a crime has been committed. This is tantamount to requiring clear and convincing evidence of what essentially is a finding of probable cause. We conclude, therefore, that the higher standard adopted in *Artukovic* does not apply to section 243(h)(2)(C), and conclude that this case is con-

McMullen argues that there is no specific evidence linking him to any civilian-targeted terrorism by the PIRA, but only to arms shipments and the bombing of military installations, actions which he asserts are political crimes. We need not determine whether these admittedly violent acts are "political offenses," because we find that the BIA's conclusion that there were "serious reasons" to believe McMullen had participated in the unprotected, nonpolitical acts of violence aimed at civilians is supported by substantial evidence.

The BIA need not find as a matter of fact that McMullen was directly involved in the unprotected acts, either beyond a reasonable doubt or by a preponderance of the evidence. Rather, the statute requires the BIA to find only *"serious reasons* for considering that [he] has committed" such acts. 8 U.S.C. § 1253(h)(2)(C) (emphasis added). Article 1(F) of the Convention has identical language. This language requires only probable cause. Once the conduct is determined to be a serious nonpolitical crime, the Convention requires only a finding of probable cause to believe the alien has committed the crime in order to find "serious reasons." *See Sindona,* 619 F.2d at 174.

McMullen admits that he was an active member in the PIRA, that he trained its members and participated in unlawful arms shipments as well as bombings of military installations. With regard to the PIRA itself, there is no question that it has undertaken terrorist activities directed at civilian targets in a manner unprotected as a political offense. We conclude that the "totality of the circumstances," *cf. Illinois v. Gates,* 462 U.S. 213, 230, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983), which include McMullen's willing and material involvement in a terrorist organization that carried out acts of violence against civilians, his assistance in training members of that organization and procuring arms shipments, support the BIA's conclusion that there are "serious reasons" to believe that McMullen committed some of these unprotected, serious nonpolitical crimes. McMullen's claims that he did not actually participate in the civilian violence, even if true, do not help his cause. We are unmoved by the pleas of a terrorist that he should not in any way be held responsible for the acts of his fellows; acts that, by his own admission, he aided by training others and assisting in arms shipments, and otherwise abetted and encouraged.

We interpret both the Convention and the Act to permit deportation of individuals who commit serious, nonpolitical crimes, and we have concluded that this includes terrorist acts against ordinary citizens. We refuse to interpret these documents to apply only to those who actually "pulled the trigger," because we believe that this interpretation is too narrow. In our judgment, the only reasonable interpretation of the exception is that it encompasses those who provide the latter with the physical and logistical support that enable, modern terrorist groups to operate. McMullen's own admissions place him in this group, and substantial evidence in the record supports the conclusion that there are "serious reasons" to believe that he has committed serious nonpolitical crimes. Therefore, we conclude that the BIA did not err by refusing to withhold deportation under section 243(h)(2)(C), 8 U.S.C. § 1253(h)(2)(C).

### III

The foregoing obviates the need to decide whether the BIA also properly refused withholding of deportation under section 243(h)(1), 8 U.S.C. § 1253(h)(1), since one valid ground for refusal to withhold is sufficient. Similarly, we need not decide whether the BIA correctly concluded that McMullen was not a "refugee" within the meaning of 8 U.S.C. § 1101(a)(42)(A), and thus not entitled to asylum under section 208 of the Act, 8 U.S.C. § 1158. We conclude that the substantial evidence supporting the conclusion that there are serious reasons to believe McMullen committed serious, nonpolitical crimes, in conjunction

trolled by the substantial evidence standard

adopted in *McMullen I,* 658 F.2d at 1316.

with McMullen's illegal entry, is sufficient to support a discretionary denial of asylum under section 208. We could not find it an abuse of discretion for the Attorney General to deny asylum for one who he has probable cause to believe has committed such crimes, since Congress has found such individuals undesirable. Thus, we conclude that since McMullen is a member of one of the undesirable groups of section 243(h)(2), the denial of his asylum petition was not an abuse of discretion. *See Carvajal-Munoz v. INS,* 743 F.2d 562, 568–69 (7th Cir.1984).

PETITION DENIED.

GOODWIN, Circuit Judge (specially concurring):

I agree that the BIA did not abuse its discretion in denying refugee status to McMullen, and that McMullen's conduct before entering the United States renders him ineligible for mandatory withholding of deportation. I disagree with the majority's reliance upon § 1253(h)(2)(C) to show his ineligibility. Section 1253(h)(2)(C) envisions a showing of the alien's personal culpability for the serious nonpolitical crime allegedly committed. The majority attributes to McMullen responsibility for the acts of other PIRA members during the period of his membership. Because none of the acts allegedly committed by McMullen can properly be cast as nonpolitical, the reliance upon § 1253(h)(2)(C) is misplaced.

The BIA, however, relied in the alternative upon § 1253(h)(2)(A) to deny McMullen § 1253(h)(1)'s protection. Section 1253(h)(2)(A) creates an exception to the mandatory withholding of deportation when the Attorney General determines that "the alien ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion." McMullen admits to having illegally imported arms for PIRA use, and to having trained its members. The BIA found that the PIRA killed or attempted to kill those who publicly opposed their activities. McMullen's admitted role in PIRA operations, though only tangentially related to such attacks, amounts to the assistance of this persecution on account of political opinion. I stress that it is the attacks aimed at suppressing the political debate and not the sometimes random attacks on civilians that lead to this conclusion. This circuit has expressly declined to distinguish civilian from military targets in defining a political crime. *See Quinn v. Robinson,* 783 F.2d 776 (9th Cir.1986). Although *Quinn* arose in the extradition context, its reasoning applies with equal force in this deportation case. The majority's attempt to distinguish deportation from extradition for the purpose of defining political offenses amounts to no more than a distinction without a difference. I would deny the petition solely on the ground that the BIA properly invoked § 1253(h)(2)(A).