# In re Sean O'CEALLEAGH, Respondent

File A77 288 177 - San Pedro

*Decided August 30, 2006*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1)  In order for an offense to qualify for the "purely political offense" exception to the ground of inadmissibility under section 212(a)(2)(A)(i)(I) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(2)(A)(i)(I) (2000), based on an alien's conviction for a crime involving moral turpitude, the offense must be completely or totally "political."

(2)   The respondent is inadmissible where he properly conceded that his offense, substantively regarded, was not "purely political," and where there was substantial evidence that the offense was not fabricated or trumped-up and therefore did not qualify from a procedural perspective as a "purely political offense," because the circumstances surrounding his conviction in Northern Ireland for aiding and abetting the murder of two British corporals reflected a sincere effort to prosecute real lawbreakers.

FOR RESPONDENT:  James M. Byrne, Esquire, San Francisco, California

FOR THE DEPARTMENT OF HOMELAND SECURITY:  Richard G. Vinet, Assistant Chief Counsel

BEFORE:  Board Panel: OSUNA, Acting Vice Chairman; FILPPU and PAULEY, Board Members.

PAULEY, Board Member:

In a decision dated April 23, 2004, an Immigration Judge found that the respondent was not inadmissible under section 212(a)(2)(A)(i)(I) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(2)(A)(i)(I) (2000), for having been convicted of a crime involving moral turpitude ("CIMT"), and admitted him to the United States as a returning lawful permanent resident. The Immigration Judge determined that the respondent was not inadmissible based on her finding that his conviction was for a "purely political offense" and was therefore expressly excepted from section 212(a)(2)(A)(i)(I) of the Act. The Department of Homeland Security ("DHS") has appealed from that decision. The appeal will be sustained and the proceedings will be remanded.

## I.  FACTUAL AND PROCEDURAL HISTORY

The respondent, a native of the United Kingdom and citizen of Ireland, was convicted in 1990 in Northern Ireland of aiding and abetting the murders of two British corporals in 1988, causing grievous bodily harm, and false imprisonment.[1]  The conviction, rendered by a court that had been established to try political-type crimes in Northern Ireland (the Diplock Courts, which were conducted without a jury), arose out of the events of March 19, 1988, when the two British corporals were killed in Belfast, Northern Ireland.  The incident occurred during the funeral of another murder victim, who had himself been killed by a loyalist gunman at an Irish Republican Army ("IRA") funeral.

According to the trial court's written decision,[2] a car being driven by the British corporals had approached the funeral cortege after a number of marshals had tried to wave the driver down.  The driver then attempted to pass the procession by mounting a footpath at the side of the road.  When blocked by the cortege and its crowds, the vehicle attempted to escape by turning into a service road but then reversed at a fairly fast speed.  By then the car had attracted the attention of some of those in the crowd, and several vehicles blocked its exit.  A group of youths attacked the car and, after breaking the windows, pulled the occupants out of the vehicle.  There was a brief respite when the crowd saw that the occupants were armed, but the crowd soon resumed its attack.  Each soldier, surrounded by persons striking him, was dragged into a nearby park, stripped of most of his clothing, and further assaulted.  After being savagely beaten, the corporals were forced into a taxi and driven to an area where they were forced out of the car.  After a final struggle, a gunman shot each officer and fled.

When questioned more than 10 months later, the respondent (who was not shown to be a member of the IRA) told the police that although he had been present at the funeral and had seen the initial attack on the car, he had not taken part.  The trial court, however, found that the evidence showed that the respondent had been "close to the car when the mob [was] breaking into it and dragging out the soldiers and beating them."  The court also found that the respondent was thereafter "an active participant in the onslaught," was among the group that violently led one of the soldiers to the park, "play[ed] at least

---

[1]  The DHS charged only the aiding and abetting offense as a CIMT ground of inadmissibility.

[2]  Our recitation of facts as to the events of March 19, 1988, is drawn from the criminal court's written decision, which was made part of the record by the Immigration Judge.  Because this document is a publicly available source, we have determined that our discussion of its contents would not be in conflict with the Immigration Judge's protective order dated April 22, 2004.  *See* 8 C.F.R. § 1003.46 (2006).

a supporting role in imprisoning and assaulting" the British soldiers, "appear[ed] to take part in carrying" one of them, and was "present when the taxi left with the soldiers and their captors on board." The respondent was not accused of accompanying the doomed officers during the final taxi ride or of participating in the actual murders. He was convicted based on a theory of "common purpose," which his attorney failed to challenge.

For his role in the incident, the then 19-year-old respondent was sentenced to life in prison. The respondent appealed his conviction, but his appeal was dismissed on July 5, 1991. The respondent served more than 8 years in a prison designated for political prisoners before his release pursuant to the Good Friday Accord on April 10, 1998. The Good Friday Accord had followed an agreement between the British Government and the IRA, pursuant to which the British Government had agreed to the early release of certain prisoners once the IRA called a cease-fire.

In 2001 the respondent secured lawful permanent resident status in the United States after filing an application for adjustment of status that disclosed his conviction for a CIMT. On February 25, 2004, the respondent applied for admission to the United States as a returning resident alien. The DHS placed the respondent in removal proceedings, charging him with inadmissibility under section 212(a)(2)(A)(i)(I) of the Act. That section makes inadmissible "any alien convicted of, or who admits having committed, or who admits committing acts which constitute the essential elements of . . . a crime involving moral turpitude (other than a purely political offense)." The Immigration Judge's finding that the respondent's conviction was for a "purely political offense" was based on her determination that he was prosecuted, incarcerated, and eventually released as a political criminal. The DHS challenges that finding on appeal.

## II. LEGAL FRAMEWORK

This is a case of first impression, in that none of our published decisions has considered the meaning of the term "purely political offense" under section 212(a)(2)(A)(i)(I) of the Act.[3] Before addressing the relatively narrow issues in this case, we will begin by briefly setting the stage in terms of

---

[3] Nor have we defined the term in the other context in which it appears in the Act: section 101(a)(43)(F) of the Act, 8 U.S.C. § 1101(a)(43)(F) (2000) (describing certain crimes of violence as aggravated felonies). A somewhat similar term, "serious nonpolitical crime," though stated in the obverse and lacking the adverb "purely," serves as a ground of ineligibility for asylum and withholding of removal. *See* sections 208(b)(2)(A)(iii), 241(b)(3)(B)(iii) of the Act, 8 U.S.C. §§ 1158(b)(2)(A)(iii), 1231(b)(3)(B)(iii) (2000); *see also McMullen v. INS*, 788 F.2d 591 (9th Cir. 1986), *overruled on other grounds*, *Barapind v. Enomoto*, 400 F.3d 744 (9th Cir. 2000).

exploring the legislative background and apparent origin of the "purely political offense" provision, the types of "political offenses" that exist, and the standard we will employ to determine whether the respondent's crime qualifies as a "purely political offense."

## A. Origin of the Provision

The current "purely political offense" provision first appeared in section 212(a)(9) of the Immigration and Nationality Act of 1952, Pub. L. No. 82-414, 66 Stat. 163, 182. It appears to be the successor of virtually identical language enacted as the second proviso to section 3 of the Immigration Act of February 5, 1917, 39 Stat. 874 (relating to an "offense purely political"). That language, which was repealed by the 1952 Act, was considered by the Central Office of the former Immigration and Naturalization Service in *Matter of K-*, 4 I&N Dec. 108 (C.O. 1950). However, although the language appears to have been in effect in 1941, we did not allude to it in our decision in *Matter of B-*, 1 I&N Dec. 47 (BIA, A.G. 1941). In that case, we held, without regard to an exception for "offenses purely political," that section 3 of the Act of 1917, which authorized the exclusion of aliens found guilty of committing a CIMT, would not be applied to a German Jew who had been convicted under the Nazi regime based on trumped-up fraud charges, because the "conviction occurred primarily because of political considerations, to wit: the fact that the defendant was a Jew."[4] *Id.* at 50.

---

[4] At the time of the passage of the Immigration and Nationality Act of 1952, the House of Representatives Managers stated:

> In order to remove any fear that under the provisions of the bill certain religious, racial, or political persecutees would be arbitrarily excluded from admission to or deported from the United States, the conferees desire to make a few clarifying statements. Regarding the sections of the bill which provide for the exclusion of aliens convicted of two or more offenses, other than purely political offenses, it is the opinion of the conferees that those convictions which were obviously based on trumped-up charges or predicated upon repressive measures against racial, religious or political minorities, should be regarded as purely political in nature and should not result in the exclusion of the alien.

Conf. Rep. No. 82-2096 (1952), *reprinted in* 1952 U.S.C.C.A.N. 1753, 1754, 1952 WL 3083. We read the statement as likely reflecting an awareness of *Matter of B-*, *supra*, and *Matter of K-*, *supra*, and as an express reassurance that persons who are the subjects of political prosecutions should be included in the protected category.

## B. Political Offenses

There appear to be essentially three types of "political" crimes that have been identified, primarily in the extradition context. One sort, which the respondent essentially contends is applicable to his conviction, involves baseless, trumped-up, or fabricated charges. There is no dispute among the parties that a fabricated or trumped-up charge may be a "purely political offense," as indeed we held in *Matter of B-, supra*.[5] A second type of "political" offense, not involved here, is one that consists of an act or acts directed against the State, such as treason, sedition, or espionage, that contains none of the elements of ordinary crimes. The third kind of "political" crime, again not at issue here and denominated under extradition law as a "relative" political offense, is one in which a common offense such as murder, assault, or theft is so connected with a political act that the offense is regarded as "political." *See* 31A Am. Jur. 2d *Extradition* § 44 (2002); *see also Quinn v. Robinson*, 783 F.2d 776, 793-94 (9th Cir. 1986). We have no occasion to explore the extent of portability of extradition principles to the "purely political offense" language we must apply, except to note the very different purposes served by extradition and removal or exclusion proceedings.[6]

---

[5] Department of State regulations also support this interpretation: "The term 'purely political offense', as used in INA 212(a)(2)(A)(i)(I) of the Act, includes offenses that resulted in convictions obviously based on fabricated charges or predicated upon repressive measures against racial, religious, or political minorities." 22 C.F.R. § 40.21(a)(6) (2006). Our reading is confirmed by the Department of State's Foreign Affairs Manual, which provides:

> Where there is any indication that the offense for which the alien was convicted was of a political nature, or prosecution therefor was politically motivated, the consular officer shall request CA/VO/L/A to make a determination. The imposition of a cruel or unusual punishment, or of a punishment which is clearly disproportionate to the offense, as well as cases falling within the provisions of 22 CFR 40.21(a)(6), raise the question as to whether the conviction was for a purely political reason.

Vol. 9 Foreign Affairs Manual, Subpart C, 22 C.F.R. § 40.21(a), note 10(a) (TL: VISA-46; Aug. 26, 1991) (Political Offenses).

[6] The United States Court of Appeals for the Ninth Circuit, in which this case arises, has indicated that in determining whether an offense is "political" in nature for immigration purposes, extradition law may serve as a guide. *McMullen v. INS, supra*. The same was found by the Central Office in *Matter of K-, supra*.

## C. Applicable Standard

As previously observed, the language at issue here has never been the subject of interpretation by the Board or, to our knowledge, a Federal court. The question whether an offense is merely "political," as opposed to "purely political," for purposes of eligibility for asylum and withholding of removal has, however, been considered. We note that in *INS v. Aguirre-Aguirre*, 526 U.S. 415 (1999), the Supreme Court endorsed the balancing test we set forth in *Matter of McMullen*, 19 I&N Dec. 90, 97-99 (BIA 1984), for determining whether an offense was a "serious nonpolitical crime," that is, whether the common-law or criminal character of the acts *outweighed* its political nature.

But we conclude that this test is not applicable here. The phrase that we must interpret in this case is "*purely* political offense," not "serious nonpolitical crime." Unless we are to disregard Congress's choice to include the adverb "purely," we must give that word substantive meaning. *See, e.g.*, *United States v. Menasche*, 348 U.S. 528, 538-39 (1955) (stating that every clause and word should be given effect, if possible, in interpreting a statute).[7]

Among the dictionary meanings assigned to the term "pure" are "not mixed," "complete," and "total." *See Webster's II New College Dictionary* 899 (1995). Taking these definitions into consideration, we find that an offense must be found to be completely or totally "political" in order to qualify for the CIMT exception. In sum, because of Congress's use of the word "purely" in section 212(a)(2)(A)(i)(I), we conclude that a balancing test is not appropriate in this quite different context.

## III. DISCUSSION

The respondent has conceded that his crime, judged from solely a substantive perspective, was not "purely political,"[8] and that the Immigration Judge relied exclusively on the circumstances surrounding the prosecution and punishment of the offense to reach her conclusion that the offense nevertheless fit that description. This concession, if well founded, greatly simplifies our task, for we need not then examine in depth whether the offense

---

[7]  We recognize, as the Supreme Court recently reaffirmed, that this canon of statutory construction is not a mandate and may not be used to lead to a resulting interpretation that is at odds with congressional intent. *See Scheidler v. National Organization for Women, Inc.*, 126 S. Ct. 1264 (2006). But, unlike in that case, we find nothing here to indicate that the term "purely" should not be given effect, nor any reason not to accord the term its natural meaning.

[8] According to the respondent's brief, he "is not claiming that the alleged acts for which he was convicted were purely political, but the conviction was a purely political conviction."

would meet a "political offense" test viewed exclusively through a substantive lens, much less qualify as a "purely political offense."

We will briefly digress to find that there is good reason for the respondent's concession that his crime fails to meet the test enunciated above. The United States Court of Appeals for the Ninth Circuit has held that "for a criminal act to be 'political,' the individual must have been motivated by political reasons." *INS v. McMullen*, 788 F.2d 591, 597 (9th Cir. 1986), *overruled on other grounds*, *Barapind v. Enomoto*, 400 F.3d 744 (9th Cir. 2000). This sine qua non aspect of a "political" crime is not present here.

The respondent's charged crime was aiding and abetting the murder of two members of a military force that had been perceived by nationalist individuals as an occupying power in Northern Ireland for the previous two decades. The crowd of mourners into which the victims lucklessly drove likely viewed the armed men as provocateurs, or perhaps even as physical threats—not surprisingly in such a volatile atmosphere so recently after the murders of several nationalist mourners by a loyalist at just such a funeral. But while the respondent's offense certainly took place in a political milieu and may have been committed in some small part for political reasons, the principal, and perhaps even sole, motivation appears to have been anger or revenge directed at the unfortunate British corporals by the funeral attendees, of which the respondent was one. We thus find that if viewed from the perspective of assessing whether the crime was purely political as a substantive matter, the ruling below clearly could not have withstood scrutiny, and that the respondent's concession to that effect is therefore well justified.[9] *Barapind v. Enomoto, supra*.

We come, therefore, to the nub of the case: whether the respondent's offense of aiding and abetting the murder of the two British corporals was a fabricated charge or the equivalent. In this regard, the respondent contends that "it is quite clear from the findings of facts by the [Immigration Judge] that the

---

[9] Given this conclusion, we need not reach the DHS's argument that the crime also fails to meet the substantive "purely political offense" standard on another ground–namely the Supreme Court's and Ninth Circuit's endorsement of our approach in *Matter of McMullen, supra,* particularly our exclusion from the political offense category of any crime that "'is grossly out of proportion to the political objective or if it involves acts of an atrocious nature.'" *INS v. Aguirre-Aguirre, supra*, at 429 (quoting *Matter of McMullen, supra*, at 97-98).

Likewise, we need not decide the DHS's further contention that the terms of the current extradition treaty between the United States and the United Kingdom exclude from the political offense exception those types of offenses of which the respondent was convicted. However, we observe that like the Ninth Circuit, we have held that the issues involved in a deportation hearing differ from those involved in an extradition case, and that resolution of even a common issue in one proceeding is not binding in the other, because extradition and deportation proceedings are distinct and separate. *See McMullen v. INS, supra*, at 596.

respondent was not involved in the murder," a conclusion that he asserts is echoed by many other groups and commentators. Among these he notes the criticism in a House Concurrent Resolution of the 105th Congress of the "controversial doctrine of common purpose convicting people such as Sean Kelly . . . on the premise that they should have anticipated the actions of others around them." H.R. Con. Res. 152, 105th Cong., 143 Cong. Rec. E2368 (1997), 1997 WL 712708. The respondent essentially argues that he is innocent of aiding and abetting the killings of the two British corporals, from which it would also follow that any punishment would be disproportionate, and that his crime was therefore essentially trumped up or fabricated. Consequently, he contends that if only the manner of prosecution and punishment are considered, the crime was properly determined by the Immigration Judge to be a "purely political offense."

We conclude, however, that the offense was not fabricated. Nor were the prosecution and conviction purely political, within the meaning of the "purely political offense" concept. There is no question that the murders of the victims occurred, and there was evidence that the respondent played a role in violently leading the soldiers to the park and otherwise participating in their assault. The degree of the respondent's involvement in the ultimate crime of murder may not have satisfied the concept of "aiding and abetting" under United States law. *See* 18 U.S.C. § 2 (2000).[10] However, such a correlation is not required for a determination that the offense was not fabricated or trumped up in the sense that (i) the charging and convicting authority–here the British Government–lacked a good faith belief that the charges and conviction were well founded and (ii) the respondent was prosecuted only for political purposes.

Neither the United Kingdom nor any other country is required to adhere to the elements of an aiding and abetting offense under our law. And while there may be some limit to how far a foreign government may go in defining an offense without rendering permissible a conclusion that the offense is "purely political," we find that that limit was not exceeded or even approached in this case through the use of the concept of "common purpose." The circumstances surrounding the respondent's conviction reflect a sincere effort to identify and punish those persons genuinely responsible for the deaths of the soldiers. The use of special provisions associated with the Diplock court system, the location of the respondent's confinement, and his release pursuant to the Good

---

[10] *See, e.g., Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949) ("In order to aid and abet another to commit a crime it is necessary that a defendant 'in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed.'" (quoting Learned Hand in *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938))).

Friday Accord are, to be sure, relevant factors that favor his claim. Those factors, however, do not overcome the substantial evidence of a bona fide effort to prosecute real lawbreakers such that the respondent's conviction falls within the exception he invokes.[11]

## IV. CONCLUSION

We conclude that the respondent's crime was not fabricated and that it cannot otherwise be considered a "purely political offense" when viewed in the totality of all relevant circumstances. We will therefore vacate the Immigration Judge's decision that the respondent's conviction falls within the "purely political offense" exception to section 212(a)(2)(A)(i)(I) of the Act. Consequently, we find that the respondent is removable as charged, and we will remand the record for further proceedings.

**ORDER:** The appeal of the Department of Homeland Security is sustained.

**FURTHER ORDER:** The decision of the Immigration Judge is vacated and the record is remanded for further proceedings consistent with the foregoing opinion and for the entry of a new decision.

---

[11] We note also the DHS's point that a number of individuals tried for crimes arising out of the same episode were acquitted, and that the conviction/acquittal rate for the special Diplock courts employed in his case was approximately the same as for ordinary criminal courts functioning in Northern Ireland. Such facts are not consistent with a conclusion that the British Government was bent on prosecuting and convicting the respondent for purely political reasons.