KAREN NELSON MOORE, Circuit Judge,
concurring.
I agree with the majority’s resolution of the jurisdictional issue and its observation that not all rock-throwing constitutes a “serious nonpolitical crime” barring asylum and withholding of removal under 8 U.S.C. §§ 1158(b) (2)(A) (iii), 1231(b)(3)(B)(iii). I write separately, however, because I believe this case compels us to do more than remand for clarification of the Board of Immigration Appeals’s *826 (“BIA”) reasoning. Specifically, I would grant the petition on the basis that the immigration judge (“IJ”) committed legal error in failing to consider the full context of Berhane’s rock-throwing and that the IJ’s ultimate finding was not based on substantial evidence.
The serious-nonpolitieal-crime provision of the Immigration and Nationality Act (“INA”) renders an applicant ineligible for asylum and withholding of removal when “the political aspect of an offense outweighs its common-law character.” INS v. Aguirre-Aguirre, 526 U.S. 415, 429, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999). In this case, the BIA affirmed the IJ’s determination “that the political aspects [of Berhane’s crime] were outweighed by the criminal law aspects,” citing a single paragraph from the IJ’s opinion. J.A. at 279.
The majority explains that the BIA’s opinion can be read in two ways: (1) as holding that any rock-throwing during political demonstrations is a serious nonpolitical crime, or (2) as holding that the combination of throwing rocks at twenty demonstrations, burning tires and placing boulders in the street, and damaging property and harming officers makes Berhane’s conduct a serious nonpolitical crime. The majority returns the case to the BIA because the former rationale would not be a proper basis for denying asylum. I agree, but I would reach an issue that the majority does not decide. For several reasons, I believe that even if the BIA intended to rely on the second rationale, its order would not support application of the statutory bar.
First, it should weigh heavily in the balance that much of Berhane’s rock-throwing can be attributed to self-defense. Berhane testified that he threw rocks at officers when the police advanced toward the crowd and when they struck protestors, and generally not otherwise. J.A. at 76, 89. As the majority states, the self-defense motivation “diminish[es] the criminal nature of his actions.” Maj. Op. at 825. Insofar as the BIA found no error in the IJ’s weighing of the criminal and political aspects of Berhane’s acts, crediting Berhane’s self-defense claim suggests a different outcome. The BIA’s failure to consider the impact of Berhane’s self-defense claim on the criminal-political balancing constitutes legal error.
Second, Berhane’s crime is not egregious. Berhane did not himself burn tires, and there is no evidence that anyone around him possessed grenades.[1] On the facts of this case, the setting of large rocks in the street was so nonviolent and defensive an act that its criminal aspects cannot outweigh its political aspects. And any damage to civilian cars was unintentional. Even on the second rationale discussed by the majority, then, this case boils down to throwing rocks at police officers and police cars during political demonstrations.[2] *827 Cars were damaged, but the IJ, quoted by the BIA, found only that police “probably” were “injured.” J.A. at 212, 279. The frequency of the rock-throwing, meanwhile, cannot be dispositive, as at each protest Berhane’s conduct had political aspects.
Moreover, as the majority observes, Berhane’s conduct is far less serious thán that involved in reported cases in which the courts have approved serious-nonpolitieal-crime determinations. In Aguirre-Aguirre, a former member of a rebellious student group set fire to passenger buses, stoned and tied up bus passengers, and vandalized private shops. Aguirre-Aguirre, 526 U.S. at 421-22, 119 S.Ct. 1439. In Chay-Velasquez v. Ashcroft, 367 F.3d 751 (8th Cir.2004), the petitioner was a member of a student group that broke windows on government buildings, marched and fought with police, and burned civilian buses. Id. at 753. Significantly, the petitioner himself in that case made bottle bombs to throw at the police. Id. In McMullen v. INS, 788 F.2d 591 (9th Cir.1986), the petitioner took part in bombings, trained fellow paramilitants, and organized illegal arms shipments while part of the Provisional Irish Republican Army. Id. at 593. In Efe v. Ashcroft, 293 F.3d 899 (5th Cir.2002), the petitioner left a political demonstration, retrieved a knife from his home, returned to the demonstration, and murdered a police officer there. Id. at 906. And in Guo Qi Wang v. Holder, 583 F.3d 86 (2d Cir.2009), the petitioner extracted organs and tissue from executed prisoners in China and once removed the skin from a person who was still alive. Id. at 88-89, 91.
In several of these cases, the court was moved by the applicant’s choice of civilian targets for his violence, see Aguirre-Aguirre, 526 U.S. at 423, 119 S.Ct. 1439; Chay-Velasquez, 367 F.3d at 754-55; McMullen, 788 F.2d at 595-98 — an element missing from the instant case. While we must be cautious about drawing a sharp legal line according to which relief turns on the identity of the targets of crime, the BIA should have considered that factor as part of a totality-of-the-circumstances inquiry, just as the Supreme Court did in Aguirre-Aguirre.
Third, the BIA gave the political context of the rock-throwing short shrift. Berhane was an active member of a reform political party committed to the democratization of Ethiopia, a country in which political prisoners numbered in the thousands. J.A. at 183 (State Dep’t Report 2005). In May 2005, the country had its first actively contested parliamentary elections. Though polling was “generally credible,” “irregularities and intimidation of .voters and election observers marred polling in many areas.” J.A. at 177 (State Dep’t Report). The Carter Center, an election-monitoring NGO, reported:
*828 In places we have found evidence that ballot boxes have been moved improperly, were improperly secured, or that party agents were barred from polling stations or were not allowed to watch the entire count. Our observers have received, and in some cases have been able to confirm, reports of election day and postelection intimidation and harassment. In some cases our observers report that [National Election Board (“NEB”)] personnel have been slow to mobilize in investigating charges of electoral problems. In addition, in some of the areas visited in the postelection period, observers have experienced difficulty accessing information from local NEB officials.
J.A. at 150 (Carter Center 6/3/05 Report). Once the ruling party announced the results, the Coalition had taken “far fewer [seats] than [it] believed it was due.” J.A. at 131 (N.Y. Times 5/14/05). The government then quickly changed the parliament’s procedural rules to block the Coalition’s ability even to raise an issue for discussion in that body. Id. With good cause to believe the election results had been tampered with, Berhane and thousands of other Coalition members engaged in a classic form of dissent: they took to the streets. The prime minister quickly banned all protests for a month and later extended the ban. J.A. at 156-57. “[A]uthorities arbitrarily detained, beat, and killed opposition members, ethnic minorities, NGO workers, and members of the press” and “imposed additional restrictions on civil liberties, including freedom of the press and freedom of assembly.” J.A. at 177 (State Dep’t Report). A European Union observer mission expressed “[s]erious concern over the threats and intimidations of opposition parties, including isolated cases of murder.” J.A. at 154 (BBC HardBall Interview with Prime Minister Meles Zenawi).
Nonetheless, the Coalition protestors continued to rally. They faced military and police forces who to them represented the repressive regime that had just committed widespread electoral fraud. That regime had also closed off alternative, legitimate avenues for dissent by cracking down on the press, banning even peaceful demonstrations, and arresting and murdering opposition leaders. And it had reacted to protests with “excessive and indiscriminate use of force,” shooting into crowds and killing over forty protestors in one demonstration. J.A. 158 (BBC, citing Amnesty International), 178 (State Dep’t Report). In that context, is it truly a disproportionate act for a Coalition protestor to throw rocks at police officers, some of whom had shields? J.A. at 89.[3]
*829 In sum, Berhane’s rock-throwing was not egregious, may not even have been criminal at times, and was thoroughly.political. At the very least, the BIA’s failure to consider fully the context of Berhane’s acts constitutes legal error. Had the BIA looked at the full picture, moreover, I believe that the evidence would have compelled it to conclude that a pro-democracy activist who throws rocks at political demonstrations in self-defense and to protest election fraud by a regime that had silenced the press, banned free assembly, rounded up the opposition, and killed unarmed civilians did not commit a “serious nonpolitical crime.” For these reasons, I would go further than the majority, which elects only to remand for clarification at this point. I would grant the petition for review.

. A New York Times article indicated that the Ethiopian government "accus[ed]” protestors of hurling grenades, J.A. at 131, and a State Department report stated that some protestors "were armed with ... grenades,” J.A. at 178, but there is no evidence that this happened at the protests that Berhane attended. During the IJ hearing, government counsel noted that one news article indicated that grenades were thrown at protests and then asked Berhane, "Did you or anyone in your group have grenades?” Berhane replied simply, “Me, I didn’t have any.” J.A. at 75-76. It would be a leap to infer that others protesting with him did have grenades. Certainly, the IJ made no such finding.

. On these facts, we confront a case more complicated than others we have seen in this area of immigration law. To date, we have reviewed serious-nonpolitical-crime determinations in only two cases. In one of those cases, the crime in question had no political valence at all and thus required no balancing of political versus criminal aspects. Urbina-Mejia v. Holder, 597 F.3d 360, 363, 369 (6th *827 Cir.2010) (former gang member had robbed civilians, sometimes striking them with a baseball bat). In the other, the crime in question had no real criminal valence and likewise required no balancing. Perkovic v. INS, 33 F.3d 615, 616, 622 (6th Cir.1994) (Yugoslavian man of ethnic Albanian descent did not commit a serious nonpolitical crime when he manufactured Albanian national flags and posters, posted them in public places, removed Yugoslav signs and flags, and organized civil-rights study groups). The instant case is the first that involves a “relative” political crime, one that has both criminal and political aspects. See McMullen v. INS, 788 F.2d 591, 596 (9th Cir.1986). In vacating and remanding, we make clear that protestors need not be peaceful to escape the serious-nonpolitical-crime bar. In my view, this message is consistent with our duty to avoid signaling — in this case or in future ones — that mixed conduct of very low criminal character is sufficient to constitute a serious nonpolitical crime. It would be an overly harsh reading of the INA to imply that solely petitioners who have committed pure political crimes or who have caused only minor property damage will avoid the statutory bar.

. Berhane aptly cites recent events in Iran. Although Iran is a different country, the events there make the merit of Berhane's argument more palpable. In the summer of 2009, Iranian President Mahmoud Ahmadinejad defeated reform candidate Mir Hossein Mousavi in an election widely condemned for fraud. Protestors took to the streets, and the protests continued intermittently over the next several months. In December 2009, tens of thousands of students participated in huge demonstrations, and many of them threw rocks at Iranian security forces. Those forces opened fire, killing several people. The White House condemned Iran's " 'unjust suppression' of civilians.” Reuters, Five Die in Tehran Pro-Reform Protests, Dec. 27, 2009, http://www.reuters. com/article/idUSLDE5 B Q 06J20091227. President Obama himself then condemned the "iron fist of brutality” used against the protestors and called for the release of detained protestors. CNN, Obama, Merkel Condemn Crackdown on Iranian Protests, Dec. 28, 2009, http://www.cnn.com/ 2009/W ORLD/meast/12/2 8/iran.protest. reaction (internal quotation marks omitted). Congress had in the past issued resolutions supporting the protestors and condemning the Iranian regime’s crackdown after similar events. See S. Res. 193 (June 19, 2009); H. Res. 560 (June 18, 2009). These events suggest to me that pro-democracy youths who *829 throw rocks at a repressive regime’s security forces are not the type of criminals Congress intends to keep out through its statutory bar for serious nonpolitical crimes.