[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 06-11632

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
April 16, 2007
THOMAS K. KAHN
CLERK

BIA Nos. A26-969-866 & A95-895-710

RICARDO ALFONSO MELO-SAGANOME,
ANGELA ALEXANDRA BULLA-PEDRAZA,
STEPHANNY J. LEON-BULLA,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision
of the Board of Immigration Appeals

_____

**(April 16, 2007)**

Before DUBINA and COX, Circuit Judges, and SCHLESINGER,[*] District Judge.

PER CURIAM:

_____

[*]Honorable Harvey E. Schlesinger, United States District Judge for the Middle District of Florida, sitting by designation.

The principal petitioner Ricardo Alfonso Melo-Saganome, his wife, Angela Alexandra Bulla-Pedraza, and step-daughter, Stephanny J. Leon-Bulla, petition this court for review of the Board of Immigration Appeals' (BIA's) order summarily affirming the immigration judge's (IJ's) order of removal and denial of their application for asylum, withholding of removal, and relief under the United Nations Convention Against Torture (CAT).[1] Melo-Saganome challenges on appeal whether substantial evidence supported the IJ's and BIA's adverse credibility determination and the IJ's and BIA's determination that he was not eligible for asylum, withholding of removal, or CAT relief. For the reasons set forth below, we deny the petition.

## I. PROCEDURAL HISTORY

Melo-Saganome, a native and citizen of Bogota, Colombia, and his wife and step-daughter first entered the United States without inspection on October 1, 1995. Melo-Saganome's wife and step-daughter have not departed the U.S. since their arrival, but Melo-Saganome returned to Colombia from December 2001 to January 2002. He re-entered the United States on January 15, 2002 without inspection. On July 8, 2002, Melo-Saganome filed an application for asylum, withholding of removal, and relief for himself, his wife, and his step-daughter, alleging persecution

---

[1] Because Melo-Saganome is the lead petitioner and his wife and child are derivative applicants, we refer to "Melo-Saganome" for convenience.

2

based on nationality, political opinion, and membership in a particular social group. At the immigration court proceedings, Melo-Saganome testified and submitted documents to corroborate his testimony. The IJ denied Melo-Saganome's application and ordered Petitioners removed from the United States to Colombia. Melo-Saganome appealed to the BIA, which denied his appeal in a one-paragraph *per curiam* decision.

This petition for review followed.

## II. ORIGINAL APPLICATION AND SUPPORTING DOCUMENTS

We outline the facts as they appear in Melo-Saganome's original asylum application and supporting documents. According to Melo-Saganome, he was employed by the police as an escort to Liberal Party politicians in Colombia starting in 1992. Melo-Saganome contends he and his family began receiving threats in 1994. Because of his employment, he was not permitted to actively engage in political activities, but his application included a statement that his wife had participated in Liberal Party activities during her employment with a radio broadcasting station in Colombia.[2] Because of this, Melo-Saganome and his wife received death threats from the Revolutionary Armed Forces of Colombia (FARC), which had identified them as

---

[2] On Melo-Saganome's application for asylum, he answered "yes" to the question of whether he or his "family members ever belonged to or been associated with any organizations or groups" in Colombia. (AR at 436.)

"chosen political military target[s]." (AR at 440.) Melo-Saganome also stated that FARC guerillas demanded that he provide information on his boss, whom they intended to kill, and that his wife "pass a message from the FARC." (*Id*.) Additionally, according to his statement, FARC guerillas assassinated Melo-Saganome's police partner, whom they mistakenly believed to be him, and his wife's boss, who participated with the Liberal Party. He also contends that they abducted his half-brother, a Liberal Party leader.

In his statement, Melo-Saganome noted that he returned to Colombia alone in December 2001 to resettle with relatives. A few days after his return, he contends that several men arrived at his sister's home around 4:00 p.m. looking for him. These men "beat" his cousin and warned that Melo-Saganome would "not escape from [them] this time."[3] (AR at 442.) After this incident, Melo-Sagnome fled Colombia for the second time.

---

[3] To support this claim, the application contained a complaint that Melo-Saganome filed with the Attorney General's office at 3:45 p.m. on December 24, 2001, in which he stated that around 10:30 a.m. that day, individuals–at least one of whom was armed–arrived at his mother's house looking for him. The individuals argued with his cousin, who had answered the door, and warned that Melo-Saganome would not "get away alive" and would "end up with [a] mouth full of flies." (AR at 314.) Melo-Saganome was hiding "under the bed of [his] sister's daughter" during this confrontation. (*Id*.) Melo-Saganome's family contacted the police, who advised him to file a complaint with the Attorney General's Office. According to the complaint, Melo-Saganome testified that he was unsure why the individuals were after him, although he had received a letter from the FARC warning him not to become a member of the Liberal Party or to work for the Community Action Board, and an obituary. Melo-Saganome also noted that, because of the obituary, he had moved to Mexico, but had returned to Colombia on December 23rd, one day before the December 24, 2001 incident.

Melo-Saganome included the following supporting documents in his original application: (1) a letter from the president of the Municipal Council of San Francisco stating that Melo-Saganome fled Colombia because of FARC threats; (2) letters from the president of the Community Action Board noting that Melo-Saganome and his wife received death threats from outlawed groups because he was a communal leader in charge of handling State projects and she was involved in politics and distinguished for supporting programs and events on the radio; (3) Melo-Saganome's resume, indicating he worked for the National Police; (4) a letter from the Iglesia Bautista Misionera de la Gracia stating that Melo-Saganome collaborated with the Church in Charity and was forced to flee Colombia for security reasons; (5) a letter certifying that Melo-Saganome's wife was secretary of the Manager's Office for a radio station and that she resigned voluntarily; and (6) various other public records including birth certificates, passports, a Florida marriage application, and a letter granting asylum to a family member.

In August 2002, the Immigration and Naturalization Service (INS)[4] issued a notice to appear to Melo-Saganome, his wife, and his step-daughter, charging them with removability under Section 212(a)(6)(A)(I) of the INA for being present in the

___

[4] The Immigration and Naturalization Service is now a part of the Department of Homeland Security. *Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1228, n.1 (11th Cir. 2005).

United States without being admitted or paroled. At a hearing before the IJ, Melo-Saganome admitted the factual allegations contained in the notice to appear and conceded removability.

At the asylum hearing, Melo-Saganome submitted the following additional supporting documents: (1) a complaint filed with the Colombian Attorney General's Office in which Melo-Saganome stated that his half-brother, a Liberal Party leader, was abducted by FARC guerillas while campaigning and had not been heard from since; (2) a complaint to the Public Prosecutor's Office from Melo-Saganome's cousin stating that he was unable to answer his telephone any longer because of anonymous telephone threats, which he had been receiving for the past ten months, seeking the whereabouts of Melo-Saganome; (3) a September 17, 2004 acknowledgment from the public prosecutor that Melo-Saganome's sister-in-law received a letter, with the inscription of FARC EP, that threatened Melo-Saganome and his wife; (4) a letter from a councilman for the Municipality of Funza stating that Melo-Saganome's wife was a leader in the Liberal Party and she was forced to flee Colombia because of her participation in the Party; (5) a statement from Melo-Saganome's wife's aunt discussing that, on May 17, 2003, two self-identified FARC guerillas were waiting for her at her house after work and warned that they would find Melo-Saganome to kill him; and (6) a statement from Melo-Saganome's sister-in-law

6

that, on May 24, 2003, FARC guerillas appeared at her house asking for Melo-Saganome. Melo-Saganome also submitted a second statement that reiterated many of the facts set forth in his original asylum statement.

### III. THE ASYLUM HEARING

Melo-Saganome testified during the asylum hearing that he and his wife first received threats from the FARC in 1994, because he worked for the National Police as a personal escort to Liberal Party officials and she was involved in Liberal Party politics through her job at a radio station. Melo-Saganome stated that the FARC demanded at that point that he reveal secrets about his boss, whom the FARC wanted to murder, and that his wife make public announcements in favor of the FARC. Melo-Saganome's wife quit her job and they fled Colombia in October 1995 because of the death threats and the assassination of her boss, among other reasons. Melo-Saganome said that he did not apply for asylum at that time both because he was afraid to do something that might affect his family in Colombia and he did not intend to remain away from Colombia for long.

He explained that on December 1, 2001, he returned alone to Bogota, Colombia. He contacted the Liberal Party to find work and later received a job paving streets for the Community Action Board. Melo-Saganome discussed receiving a letter from the FARC a few days later stating that he could not work for

7

the government or the Liberal Party. At first he did not pay much attention to the letter because he believed that it was sent from someone who was envious of him. The following week, however, he received a death threat in the form of a condolence letter. Melo-Saganome also testified that two armed individuals arrived at his mother's house in the early morning hours of December 24, 2001 looking for him. These individuals insulted and shoved his cousin, who had answered the door, and they identified themselves as FARC guerillas as they were leaving. Melo-Saganome further testified that his brother disappeared on December 27, 2001 while traveling to attend a political campaign. Melo-Saganome fled Colombia for the second time on January 10, 2002.

On cross-examination, Melo-Saganome admitted that his wife had worked only indirectly for the Liberal Party by making political announcements on behalf of the Liberal Party, but had never been an elected member of the party and, thus, her face had never been displayed on the television or in a newspaper. Melo-Saganome also testified that he had two children from a previous marriage, a sister, a brother, and a sister-in-law who still lived in Colombia. These two children lived with his ex-wife on the outskirts of Bogota, but he had never revealed their exact location to anyone in order to protect them.

8

The Government also cross-examined Melo-Saganome about the inconsistencies between his original asylum application statement and his testimony. When asked why the original statement indicated that the December 24, 2001 incident occurred at his sister's house, while he testified that it occurred at his mother's house, Melo-Saganome responded that they lived together. When asked why the original statement indicated that the December 24, 2001 incident occurred at 4:00 P.M., while he testified that it occurred at 10:30 A.M., Melo-Saganome answered that the incident occurred at 10:30 A.M. and he reported the incident to the Attorney General's Office at 4:00 P.M. When asked why the original statement indicated that the December 24, 2001 incident occurred a few days after his return to Colombia in early December of 2001, while he testified that it occurred on December 24, 2001, the IJ interjected that Melo-Saganome testified that he received the FARC letter and condolence card a few days after returning to Colombia, but the other incident occurred on December 24th.

Melo-Saganome also testified that he wrote by hand the original application statement in Spanish, and that someone translated the statement into English without him reviewing it. He submitted the second statement to explain further what happened to him in Colombia and to correct errors in the first statement, which he admitted making.

The IJ denied the application for asylum, withholding of removal, and CAT relief, concluding, in part, that inconsistencies in Melo-Sagaonome's testimony and evidence about the primary incident that Melo-Saganome pointed to in support of his application "seriously undermines his credibility."[5] (AR at 200.) The IJ explained that she found Melo-Saganome not to be credible "[i]n view of the inconsistencies . . . and [his] failure to explain satisfactor[ily] these inconsistencies." (AR at 201-02.) In support of this adverse credibility finding, the IJ cited inconsistencies in Melo-Sagaonome's original asylum statement and his testimony and supplemental statement regarding the December 24, 2001 incident which was, according to the IJ, "the major incident on which [he was] relying as the reason for leaving his country." (AR at 200.) Specifically, the IJ noted: Melo-Saganome stated in his original statement that the December 24, 2001 incident occurred "a few days after his return," but, December 24th was not a few days from December 1st, the day he returned to Colombia (AR at 199); the original statement indicated that the FARC guerillas arrived at the house around 4:00 P.M., whereas Melo-Saganome's supplemental statement indicated that they arrived at 10:30 A.M. (AR at 200); and the original

_____

[5] The IJ listed all of the documents submitted by Melo-Saganome and noted that she had considered these documents in rendering her decision. (AR at 187-88.)

statement indicated that the FARC guerillas arrived at Melo-Saganome's mother's house, while he testified that the guerillas arrived at his sister's house. (AR at 200.)

The IJ concluded that Melo-Saganome failed to prove past persecution because he did not show that he was arrested, detained, or harmed by the Colombian government or a group that it was unable to control. Moreover, the IJ found that Melo-Saganome did not submit anything to prove that his brother was in fact missing or the reason for his disappearance.

The IJ also held that Melo-Saganome did not establish a well-founded fear of future persecution. In support of this holding, the IJ pointed out that Melo-Saganome had sufficient grounds to apply for asylum in 1995, when he first fled Colombia, but "[t]he fact that he did not apply for asylum [at that time] negates any fear that [he] claims to have in Colombia." (AR at 199.) Moreover, the IJ found that Melo-Saganome had not presented credible, sufficient, consistent or persuasive evidence to establish a well-founded fear of future persecution.

As for withholding of removal, the IJ concluded that Melo-Saganome did not present credible and sufficient evidence to prove that his life or freedom would be threatened because of his political opinion or any other protected ground if he was returned to Colombia. Additionally, the IJ found that Melo-Saganome was not

entitled to withholding of removal because he did not satisfy the lower burden of proof required for asylum.

Finally, with respect to CAT relief, the IJ found that Melo-Saganome presented no evidence that he was tortured in Colombia or that it was more likely than not that he would be tortured if returned to Colombia.

## IV. THE BOARD OF IMMIGRATION APPEALS

Melo-Saganome appealed to the BIA and included in his appellate brief a request to consider new evidence, specifically, the U.S. Department of State Colombia Country Reports on Human Rights Practices for 2004 ("2004 Country Report") and a Report to Congress on United States Policy Towards Colombia and Other Related Issues ("Colombia Report"). The 2004 Country Report noted that FARC kidnaped, tortured and killed, among others, members of the security forces. Forced disappearances, many of them politically motivated, continued to be a problem. The Colombia Report noted that the Colombian government and its citizens were under attack by the FARC and other illegal groups whose methods included murder and kidnaping. However, the Colombian government, with the United States' assistance, was combating these groups.[6]

---

[6]It is unclear whether the BIA considered this new evidence.

The BIA adopted and affirmed the IJ's decision. The BIA added that it found Melo-Saganome's testimony that he was threatened within days of his return to Colombia six years later to be implausible, given his testimony "indicating that he was threatened in 1994 – not on account of his political activities but rather to obtain information about the candidate to whom he was assigned as the police escort." (AR at 2.)

## V. CONTENTIONS OF THE PARTIES AND ISSUES ON APPEAL

Melo-Saganome argues that the IJ and BIA's adverse credibility determinations are not supported by substantial evidence. He contends that his oral testimony and written affidavit were consistent, with only minor inconsistencies that do not reach the level of providing a reasonable ground on which to make an adverse credibility finding. He maintains that the IJ failed to consider his corroborating evidence in making the credibility determination, and that the BIA relied on an unsubstantiated finding that distorted his testimony and written affidavits. Additionally, Melo-Saganome contends that the IJ and BIA improperly determined he was ineligible for asylum, withholding of removal, or CAT relief.

The Government responds that substantial evidence supports the adverse credibility findings. It argues that Melo-Saganome did not explain satisfactorily the discrepancies between the application and his testimony. Additionally, the

13

Government maintains that substantial evidence supports the findings that Melo-Saganome did not suffer past persecution, does not have a well-founded fear of persecution, and failed to establish eligibility for protection under the CAT.

We consider whether substantial evidence supports the IJ's determinations that Melo-Saganome (1) was not credible; (2) failed to establish that he was a victim of past persecution; (3) failed to establish that he has a well-founded fear of future persecution; and (4) failed to establish eligibility for protection under the CAT.

## VI. STANDARD OF REVIEW

Because the BIA adopted and affirmed the IJ's decision and added its own reasons, we review both decisions. *See Al Najjar v. Ashcroft*, 257 F.3d 1262, 1284 (11th Cir. 2001). We review factual determinations under the substantial evidence test, upholding the BIA's decision if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481, 112 S. Ct. 812, 815 (1992) (quoting 8 U.S.C. § 1105a(a)(4)); *see also D-Muhumed v. U.S. Att'y Gen.*, 388 F.3d 814, 817-18 (11th Cir. 2004). This is a highly deferential standard, and we disturb the IJ's decision only if Melo-Saganome has shown that the evidence he presented was "so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *Elias-Zacarias*, 502 U.S. at 484, 112 S. Ct. at 817. The IJ's credibility determination is a finding of fact

14

and thus judged by the same test. *Ruiz v. U.S. Att'y Gen.*, 440 F.3d 1247, 1255 (11th Cir. 2006).

## VII. DISCUSSION

To qualify for asylum or withholding of removal, an asylum applicant must present "credible, direct, and specific evidence in the record." *Forgue v. U.S. Att'y Gen.*, 401 F.3d 1282, 1287 (11th Cir. 2005) (quoting *Sangha v. INS*, 103 F.3d 1482, 1487 (9th Cir. 1997)). The IJ found Melo-Saganome lacked credibility, and the BIA affirmed, adding that Melo-Saganome's testimony was implausible.

We sit as a reviewing body engaging in a highly deferential review of BIA and IJ credibility findings. *See Al Najjar*, 257 F.3d at 1278 (citing *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425, 119 S. Ct. 1439, 1446 (1999)). Once the IJ or BIA makes an adverse credibility finding, the burden is on the applicant to show that the "credibility decision was not supported by 'specific, cogent reasons' or was not based on substantial evidence." *Forgue*, 401 F.3d at 1287 (quoting *D-Muhumed*, 388 F.3d at 819). We review this credibility determination under the substantial evidence test and "may not substitute [our] judgment for that of the BIA with respect to credibility findings." *D-Muhumed,* 388 F.3d at 818. In short, the IJ and BIA's determination that Melo-Saganome was not credible "may not be overturned unless the record

15

compels it." *Id.* at 819 (quoting *Lopez De Jesus v. INS*, 312 F.3d 155, 161 (5th Cir. 2002)).

Considering this deferential standard of review, we conclude that Melo-Saganome has not met his burden of showing that the adverse credibility finding was not supported by specific cogent reasons or was not based on substantial evidence. Both the BIA and the IJ gave specific, cogent reasons for the adverse credibility finding. The IJ found that Melo-Saganome presented inconsistent evidence and testimony as to what occurred regarding the incident of December 24, 2001, and found that Melo-Saganome failed to adequately explain why the first statement he filed with his asylum application contained material discrepancies regarding the date, time, and place of that event. The BIA adopted this finding and further added,

> Given the respondents's testimony indicating that he was threatened in 1994–not on account of his political activities but rather to obtain information about the candidate to whom he was assigned as the police escort, we find implausible the respondent's claim that he was again the target of threats within days of his return to Colombia 6 years later.

(AR at 2) (citation to record omitted).

Melo-Saganome presented evidence to corroborate his claims, but the IJ pointed out that he gave different accounts of what happened on December 24th in the corroborating documents he submitted, as well as during his testimony in court.

16

The IJ also explained that the incident on December 24th was "the major incident on which the respondent is relying as the reason for leaving his country, his inability to provide consistent information regarding that incident seriously undermines his credibility."[7] (AR at 200.) We can only disturb the IJ's decision if Melo-Saganome has presented evidence that is so compelling that no reasonable factfinder could find as the IJ did. *See, e.g., Elias-Zacarias*, 502 U.S. at 483-48, 112 S. Ct. 817. Melo-Saganome has not done so.[8]

Melo-Saganome's arguments that he established eligibility for asylum, withholding of removal, or CAT relief rely in large part on his testimony in front of the IJ. Because we conclude that the IJ did not err in making her adverse credibility finding, we need not discuss further these arguments.

We are also unpersuaded by Melo-Saganome's claim that the IJ failed to consider his corroborating documents. The IJ not only listed the corroborating

---

[7] Some circuits have held discrepancies in petitioners' asylum claims are only an adequate basis for an adverse credibility findings when those discrepancies involve matters that are at the heart of the asylum claim. *See, e.g.*, *Gao v. Ashcroft,* 299 F.3d 266, 272 (3rd Cir. 2002)*; Vilorio-Lopez v. INS,* 852 F.2d 1137, 1142 (9th Cir. 1988). In light of the IJ's finding that Melo-Saganome was not credible regarding this "major incident," we need not address whether our circuit uses this "heart of the claim" test to analyze adverse credibility findings.

[8] Although Melo-Saganome does point to a few minor errors in the IJ's oral opinion, these errors are not significant enough to convince us that no reasonable factfinder could find as the IJ did.

documents at the beginning of her oral decision, but also referred to the fact that some of the corroborating documents contradict each other.

## VIII. CONCLUSION

Melo-Saganome has failed to convince us that the record compels a reversal of the IJ's and BIA's denial of his asylum, withholding of removal, and CAT relief claims. We, therefore, deny the petition for review.

PETITION DENIED.